**Michael R. SMITH, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 112, 2005.**

Supreme Court of Delaware.

Submitted: Feb. 22, 2006.

Decided: April 27, 2006.

---

Edward C. Gill (argued) and Michael R. Abram, Law Office of Edward C. Gill, P.A., Georgetown, Delaware, for appellant.

Kim Ayvazian, Department of Justice, Georgetown, Delaware, for appellee.

Before STEELE, Chief Justice, BERGER and RIDGELY, Justices.

STEELE, Chief Justice.

On April 17, 2003, Michael R. Smith participated in a robbery that resulted in the death of George Coverdale. A Superior Court jury convicted Smith of Second Degree Murder, First Degree Murder, two counts of First Degree Robbery, Second Degree Conspiracy, and several counts of Possession of a Firearm During the Commission of a Felony. The trial judge sentenced him to life in prison. Smith now appeals his convictions. He raises nine issues on appeal. Because we find that the trial judge did not err, acted within his discretion, adequately cured errors about which Smith now complains, and that any uncured errors were harmless beyond a reasonable doubt, we affirm the trial judge's rulings and Smith's convictions.

## FACTS

The State presented two eyewitnesses to George Coverdale's murder, Shane DeShields and DeShawn Blackwell. Each told a slightly different story. Both stories, however, implicated Smith in the events that resulted in Coverdale's death. Smith testified in his own defense and related a dramatically different version of events. Because the issues primarily focus on the detail of these witnesses' testimony, it is necessary to set forth the three different versions of the events of April 17, 2003.

### The State's Case: Shane DeShields's Testimony [1]

On the morning of April 17, 2003, Shane DeShields contacted Michael Smith. Although Smith and DeShields were not related, they shared the same half-sister.

---

1. We recognize that DeShields and Blackwell's direct and cross-examination testimony were sometimes not only internally inconsistent and contradictory, but also arguably inconsistent with earlier statements. For purposes of this opinion, we draw the facts largely, though not exclusively, from the direct testimony of each witness. By convicting Smith, the jury ultimately chose to believe DeShields and Blackwell's testimony over Smith's, notwithstanding the inconsistencies, contradictions, and untrue statements that defense counsel effectively and carefully brought out on cross-examination.

DeShields informed Smith that he "had a quick way [they] could get some money" by robbing a guy nicknamed "Champ," DeShields's cousin, George Coverdale. Smith agreed to join with DeShields in the planned robbery. During the conversation, DeShields informed Smith that he did not have any guns and asked Smith to bring guns. They made plans to meet at DeShields's aunt's house. Later in the day, Smith met DeShields there. As requested, Smith brought two guns.

When Smith arrived, DeShields got in Smith's car and saw the guns for the first time. DeShields took a .357 Magnum revolver loaded with .38 bullets. Smith took a .32 automatic. Smith and DeShields then drove to the Cock & Bull lounge where they bought a bottle of Hennessey. They then went to the De–Lux Dairy Market, where DeShields made a call to Coverdale. Smith and DeShields drove over to DeShields's grandmother's house where DeShields again called Coverdale.

DeShields testified that he made the calls to Coverdale because he wanted to purchase some crack cocaine from Coverdale. Coverdale ultimately agreed to meet DeShields at DeShields's grandmother's residence for the purpose of selling him the drugs. Smith was not with DeShields when DeShields made the phone calls to Coverdale. Smith, however, knew that DeShields was going to entice Coverdale to come over by calling and saying that he wanted to buy drugs. Smith also knew that the plan, as previously discussed, was that he and DeShields would use the guns to rob Coverdale when Coverdale arrived.

After DeShields made the phone call to Coverdale from his grandmother's house, he went outside and joined Smith, who was sitting on the front steps of the housing facing the road. Sometime later, while it was still light outside, Coverdale arrived driving a burgundy Ford Aerostar van with DeShawn Blackwell in the passenger seat. After Coverdale pulled up to the house, Smith and DeShields got into the van. DeShields sat in the backseat behind Coverdale and Smith sat behind Blackwell.

Shortly thereafter, DeShields and Blackwell started arguing. While DeShields and Blackwell were arguing, DeShields's grandmother came out of the house and Coverdale started backing the van out towards the road. Apparently, Blackwell and DeShields had been in a high speed chase two or three days earlier. DeShields eluded the police, but Blackwell did not. DeShields, therefore, assumed that Blackwell "snitched" on him by telling the police that DeShields was driving. During the argument, DeShields took his gun and placed it on his lap. At some point before the shooting, DeShields obtained the drugs. DeShields did not pay for the drugs and admitted that he and Smith robbed Coverdale of the drugs.

Immediately after DeShields got the drugs, Coverdale grabbed his gun from the console side of the seat, and jumped out of the van. Smith then fired the first shot at the fleeing Coverdale from his .32 automatic, hitting the driver's side door of the van. Coverdale, who by that time was out of the van with both feet on the ground and away from the open door, shot back at the van. Then DeShields shot at Coverdale with the .357 and hit Coverdale in the chest. At trial, the parties stipulated that DeShields fired the bullet that killed Coverdale. The three shots were so close together that it seemed like "everybody [was] shooting at once." DeShields testified that he knew that there were .38 caliber bullets in the .357 because after the "stuff happened" Smith said to DeShields "you're lucky you put the .38 in him ... because you didn't want the .357 bullets in the gun." During the commotion, everybody jumped out of the van.

After the shots were fired, Smith chased after Coverdale, who was heading towards

the back of DeShields's grandmother's house. DeShields ordered Blackwell back into the van. Once Blackwell was back inside, DeShields drove behind an abandoned house on his grandmother's property. DeShields got out of the van to check on Coverdale and observed Smith pistol-whipping Coverdale in the face with the .32 automatic. DeShields pulled Smith off Coverdale.

DeShields then ran to check on Blackwell, who by then had escaped and was getting into a passing car. Finding Blackwell gone, DeShields returned to Smith and Coverdale, and again pulled Smith off Coverdale. DeShields testified that he did not know whether Smith took money or jewelry off Coverdale that day. DeShields also testified that he could not see what Smith was doing with Coverdale at the time he was moving the van and checking on Blackwell.

At some point shortly after these events, DeShields's grandmother came outside and warned him that she had called the police. DeShields and Smith got into the Smith's car and drove away.

### The State's Case: DeShawn Blackwell's Testimony

In the afternoon of April 17, 2003, Blackwell and Coverdale were at Coverdale's girlfriend's (Shawntay Corsey) apartment watching a DVD. At some point, Coverdale received a phone call on his cell phone. About ten minutes after Coverdale received the call, he and Blackwell left the apartment in a burgundy van. Coverdale drove. Blackwell sat in the passenger seat. They headed to the Concord De–Lux.

On the way, Coverdale received a phone call from DeShields. DeShields told Coverdale to meet him at his grandmother's house. Coverdale and Blackwell changed destinations and went to DeShields's grandmother's house. They stopped when they reached the driveway.

DeShields and Smith were sitting on the front porch. When the van arrived, they walked over and got in via the side door. DeShields sat behind Coverdale while Smith sat behind Blackwell. As the occupants of the van were getting ready to smoke a blunt, DeShields pulled his gun out and put the gun to Blackwell's head. All the while, DeShields was calling Blackwell derogatory names, saying that Blackwell was a snitch for "telling on" him in Laurel when DeShields got in a high-speed chase. DeShields also made statements like, "[Blackwell] you are a snitch, man, I should kill you."

Coverdale asked DeShields to calm down. At that point, Smith pulled his gun out and put it to Coverdale's head and said "Drive."[2] Coverdale "wasn't trying to

---

2. During cross examination of Blackwell, defense counsel tried to impeach Blackwell with his earlier statements. This exchange is relevant—at least because Smith presents an interesting interpretation of it in his opening brief—and we quote it at length:

Q: Now, when you first talked to Detective Maher you told him that Michael Smith said nothing at all until after the shots were fired; is that correct?

A: Yes, but he did.

Q: Was that a truthful statement?

A: I was just—must have been mixed up because he said: Drive, drive.

Q: Was that a truthful statement?

A: I must have been mixed up. Yes, it was a truthful statement when I said it.

Q: Then on April 25th you say Mike says: Drive, right?

A: Yes, that's what he said.

Q: August 3rd say [sic]: Mike says pull over; is that right?

A: Well, either way, it is all referring to drive.

Q: Pull over means drive?

A: I don't remember saying pull over. Can you please show me that, too?

Q: Sure. August 3rd, Page 64, I start on Line 15. You were asked the question: Then what happened with regard to Champ to

drive." Instead, Coverdale reached for the floor, grabbed a paper bag, jumped out of the driver's door, and started to run on the side of the van. As soon as Coverdale jumped out of the van and was "two, three steps out of the door," Smith fired a shot at Coverdale out of the side window of the van, shattering the window. Then DeShields fired. Blackwell then heard what sounded like shots from Coverdale.

During cross-examination, as defense counsel was attempting to impeach Blackwell with earlier inconsistent statements, Blackwell testified that Smith had a gray or chrome revolver while DeShields had a long black gun. On redirect, Blackwell described DeShields's gun as a .357 Magnum revolver.

When the shooting started, Blackwell got out of the van and laid down on the ground on the side of the van. When Blackwell got off the ground, Smith was behind the van and Coverdale had already been shot, but Blackwell could not tell where. Blackwell testified that he saw Smith kicking Coverdale, beating him, and hitting him with the gun. The first time Blackwell saw Smith beating Coverdale, they were behind the van.

After Blackwell got off the ground, DeShields told him to get back in the van. DeShields then drove the van behind the abandoned house. Blackwell again saw Smith beating Coverdale, only this time behind the abandoned house. Blackwell also observed Smith taking Coverdale's "[white gold] chain and stuff, snatching his chain [from around his neck] and digging in his pockets and saying: You fat, stinking MF"er, going in his pockets." As he was being beaten, Coverdale was gasping and asking Blackwell for help.

When DeShields and Blackwell got around to the abandoned house, DeShields got out of the car, opened the passenger side door, and faced Blackwell. DeShields "put [his] gun out," pointed it at Blackwell's head, and deliriously berated Blackwell. He then "started going in" Blackwell's pockets. DeShields robbed Blackwell of "everything." While robbing

and Michael Smith. Your answer was: Michael pulled his gun out and put it to Champ's head and he told him to pull over.

A: Can I see that? ... I don't remember saying that.

Q: Did you get a chance to read that over, sir?

A: Yes, sir

Q: But you don't remember saying that?

A: No, sir.

Q: If you did, would that have been a truthful statement?

A: No, sir.

Q: Now, your testimony is Michael fired the first shot?

A: Yes, he did.

Q: He fired out the back window?

A: Fired out the side window...

\* \* \* \* \* \*

In his opening brief, Smith contends that in this exchange Blackwell "admitted ... that the statement he gave that the defendant placed a gun to the head of Mr. Coverdale was false, and changed his story to that of pointing the gun out of the window." In context, it is clear that Blackwell says that his false statement was that Smith told Coverdale to "pull over" rather than "to drive." The whole exchange is about whether Smith ordered Coverdale to drive, to pull over, or whether Smith, in fact, said nothing. Blackwell clearly and unequivocally testified on direct examination that Smith put a gun to Coverdale's head and told him to drive. It takes a leap of imagination to glean from this exchange that Blackwell admitted that this never happened; particularly when defense counsel did not follow up with a question like "So you are saying that Smith never pointed a gun at Coverdale's head at all." Clearly, defense counsel asked a compound question— "Your answer was: [Smith] pulled his gun out *and* put it to Champ's head *and* he told him to pull over...[was that] a truthful statement?"—and Blackwell responded that he did not remember saying "that" and if he did, it was untruthful, but was referring only to the "pull over" part of the compound question.

Blackwell, DeShields saw Smith behind the house beating Coverdale. DeShields instructed Blackwell, "Sit right here, hold on right here" and then went over to Smith. When DeShields was halfway to Coverdale, Blackwell got out of the van and started running. He ran straight down the road passing several houses. As Blackwell was running, Carlton "Rocky" Hughes happened to pull up beside him. Blackwell dove in the back window of Hughes's car and told Hughes to drive away.

Blackwell testified that he did not see or remember there being any type of exchange of drugs between Coverdale and DeShields. Blackwell indicated that Smith and DeShields never asked for anything and that there was no exchange except for Smith taking "stuff" from Coverdale.

### The State's Case: Other Evidence

The State presented other physical and testimonial evidence to corroborate DeShields and Blackwell's testimony. To reinforce Blackwell's testimony, the State called two people with whom Blackwell had spoken shortly after the incident. The first, Shawntay Corsey, Coverdale's girlfriend at the time, testified that Blackwell called her the evening of the incident and informed her that "Poppy [Deshields's nickname] and them" shot Coverdale. Corsey also testified about what Blackwell told her about the events that led up to Coverdale's shooting including the fact that Smith pulled a gun and pointed it at Coverdale.

The second person with whom Blackwell had spoken was Carlton "Rocky" Hughes. Hughes indicated that on the night of the shooting he was driving in the vicinity of DeShields's grandmother's house. Hughes testified that he saw Blackwell running along the side of the road trying flag down Hughes. Hughes stopped and Blackwell jumped into the back seat. Blackwell told Hughes to go because,

"they were coming." Once they got closer to their destination, Blackwell told Hughes that "they were trying to kill me."

The State presented other testimonial and physical evidence. The State called Detective Keith Marvel of the Delaware State Police, the main evidence technician in this case, to describe the crime scene and to lay the foundation for the introduction of the physical evidence. Marvel explained the condition in which the DSP found the victim and the condition of the bullet-ridden van. Marvel also indicated that the DSP recovered three fired bullets; one from the driver's side front door of the van, one from the back of the middle seat of the van, and one from Coverdale's body after an autopsy was performed. Using photographs, Marvel explained the probable trajectories of the bullets recovered from the van. Marvel also testified that the DSP recovered a .38 caliber EAA snub nose revolver from the crime scene, somewhere around where they found Coverdale's body. The DSP sent the revolver and the three bullets to the ATF for testing. After Marvel testified, the State called Jodi Marsanopoli, a firearms and ballistics expert with the ATF, who tested the bullets and the gun.

Marsanopoli first testified that she examined the .38 special EAA snub nose revolver. After test-firing the revolver and comparing the tested bullet to the bullet found in the middle seat of the van, Marsanopoli concluded that the bullet from the middle seat was compatible with having been fired from the .38 special EAA revolver. Marsanopoli also examined the bullet recovered from Coverdale's body. She concluded that the bullet from Coverdale's body could not have been fired from the .38 special EAA revolver because the bullet had different rifling characteristics. The bullet recovered from Coverdale's

body, however, was consistent with having been fired from a .357 revolver.

On direct examination, Marsanopoli testified that the bullet recovered from the door was .32 caliber. Again, based on rifling, Marsanopoli concluded that the bullet recovered from the door could not have been fired out of the .38 special revolver, nor could it have been fired out of a .357. The bullet from the door, however, was compatible with having come from a .32 automatic. On cross-examination, Marsanopoli ultimately testified that the bullet recovered from the door could have come from a .32 revolver or a .32 automatic. The parties eventually stipulated that the bullet could only have come from a .32 automatic.[3]

### The Defense Case: Michael Smith's Testimony

Smith testified that on April 17, 2003 he started the day by calling a friend, Sonya Briddle, to see if he get a ride to Seaford from Maryland, where he was then living, to see his mother. Briddle's friend, Tonya Almo, agreed to take Smith to Seaford. Smith, Briddle, and Almo rode in Almo's car to Smith's mother's house in Seaford.

When they arrived at Smith's mother's house, no one was there. While Smith was inside, DeShields called and told Smith to come meet him at DeShields's aunt's house. Smith went over to meet DeShields with Briddle and Almo. He got out of the vehicle and went into the house to speak with DeShields. DeShields asked about Smith's plans for the day, to which Smith responded that he was getting ready to go back to Maryland because he and Briddle had planned to stay with his mother in Seaford, but that they came in Almo's car and she was not staying. They, therefore, needed to get Briddle's car from Maryland and come back to Seaford. Before he left, Smith gave DeShields his

pager number. Smith, Almo, and Briddle then returned to Maryland where Smith and Briddle got Briddle's car and returned to Seaford.

When Briddle and Smith returned to Seaford, they again went to Smith's mother's house. While Smith was talking to his mother, DeShields repeatedly paged Smith. DeShields asked what Smith was doing and told Smith to come pick him up. Smith agreed and then picked up DeShields. They went back to Smith's mother's house where Smith talked with his mother and sister. Smith decided that he wanted to go to the liquor store. DeShields and Smith left for the Cock & Bull liquor store. Smith drove Briddle's car, but Briddle stayed at Smith's mother's house. Because Smith did not have his ID, DeShields went in and bought a half pint of Hennessy. Smith then decided that he needed a "blunt" (a cigar filled with marijuana) so he could smoke some marijuana, but he did not have any cigars.

Smith and DeShields, then, drove to the De–Lux Market in Concord where DeShields went inside to get the cigars. DeShields came back and gave the cigars to Smith, who was still waiting in the car. DeShields then went over to the pay phone and made a call. While he was waiting, Smith rolled a blunt. After DeShields made the phone call, he got back into the car, but he did not mention the person he called. DeShields told Smith to drive back to DeShields's grandmother's house. Smith did so, driving very slowly so that they had time to finish the blunt before they arrived. On the way, Smith told DeShields that they only had enough marijuana for two more blunts and that he needed more marijuana. DeShields responded that he could get Smith some more marijuana.

**3.** *See Infra* pp. 1223–24.

After arriving at DeShields's grandmother's house, Smith got out and sat on the steps. Smith was unsure where DeShields went next, but assumed that he went into the house. When DeShields came back, he informed Smith that his cousin might have some marijuana. By the time DeShields made this statement, Smith saw a burgundy van pulling up into the yard. There were two people in the van that Smith did not recognize; one in the driver's seat, one in the passenger's seat. Smith noticed that the two people in the van were smoking marijuana. DeShields said to Smith "come smoke a blunt, get in the car for a smoke."

Smith and DeShields walked over and got into the van through a sliding door on the passenger's side. DeShields got in first and sat behind the driver. Smith got in second and sat behind the passenger. Once inside the van, DeShields said something to the driver and then they passed the blunt. Smith took a little drink of the bottle of Hennessy and put the bottle on his lap. While Smith was waiting for the blunt, he turned around to look behind him to see the stereo system in the van. After that, Smith heard DeShields saying to the passenger "you snitch, you snitched on me" and a few other bad words. When Smith turned back around, he saw DeShields pointing a gun at the passenger's head.

While this was going on, the van was slowly going up the road. The driver then threw the van into park and the van jerked forward. The driver reached in front. Although Smith did not see what the driver was reaching for, he believed the driver was reaching for a gun. Smith reached up to keep the driver from pointing the gun back in his direction or in the direction of the back seat. He knocked the driver's arm down, the driver dropped the gun, and the gun fired. Smith testified that he thought the driver was going to shoot in

his direction and was in fear for his life. He further testified that he "tried to stop him, prevent that from happening for my safety."

The driver pulled away from Smith, used his foot to open the driver's door, and got out of the van. After the driver got out of the van, he turned back around and reached back into the van. Again, Smith did not see what the driver was reaching for, but thought it was a gun. The driver grabbed a brown bag. The driver then pointed the bag at the back window near where DeShields was sitting. Smith ducked his head down. While his head was down, Smith heard gunshots but did not see a gun nor did he see DeShields fire. When Smith lifted his head back up, he saw DeShields dropping his arm and saw the driver holding himself. Smith testified that the driver fired a gun from the bag into the air.

Immediately after the shooting, Smith got out and went to the side of the van. He noticed that the passenger was on the ground and that DeShields was also outside of the van. DeShields then got into the driver's side of the van and the passenger also got back into the van. Smith testified that, at that point, he did not know where the original driver was.

DeShields drove the van away. Smith went over to his parked car, but did not leave because he could not find the keys. As Smith was looking for the keys inside the car, he saw that DeShields was around the house over by the wounded victim. Smith testified that he saw DeShields taking money out of the victim's pockets. DeShields then came over and told Smith not to say "nothing to nobody."

Smith eventually founds his keys and Smith and DeShields drove off. Smith testified that DeShields never asked him about any handguns and that he never brought DeShields any handguns. Smith

also testified that he and DeShields had no plans to rob or kill anyone.

### The Defense Case: Other Evidence

During its case in chief, the defense called Duane Dismuke. Dismuke testified that he had a conversation with DeShields while they were incarcerated together. During the conversation DeShields told Dismuke that Smith had nothing to do with the shooting. DeShields also told Dismuke to tell Smith that if Smith did not help DeShields get a lawyer, that "[DeShields] was going to bring [Smith] down with him...say that [Smith] had something to do with it."

The defense also called Keith Nelson, who while apparently not related to DeShields, saw himself as his uncle. Nelson testified that, some time before Coverdale's shooting, DeShields and Blackwell told him that they were planning on robbing somebody. Nelson also testified that a week after the shooting, Blackwell tried to sell him a gun "with a body on it"—the same gun used in Coverdale's shooting.

The jury found Smith guilty of Murder in the First Degree, Murder in the Second Degree, four counts of Possession of a Deadly Weapon During the Commission of a Felony, two counts of Robbery in the First Degree, and Conspiracy in the Second Degree.

Smith raises nine issues on appeal. Additional facts relevant to each of the nine issues Smith raises on appeal will be set forth in the section discussing those issues.

---

4. *See Defendant's Opening Brief,* pg. 8–10, emphasis added: "[Smith] testified that he was *simply* in the van as a passenger with defendant Shane DeShields, DeShawn Blackwell, and George Coverdale...[T]he defendant testified that he was *innocently* at the scene where Mr. Coverdale was killed. He had no knowledge of a robbery taking place."

### 1. Failure to instruct the jury on justification

 At trial, Smith testified that he was essentially an innocent bystander.[4] After DeShields had already drawn his gun, Smith saw Coverdale reaching for a gun. Fearing for his own life and safety, Smith reached up and hit Coverdale's arm because he thought that Coverdale would turn and fire into the back seat in his direction. This caused Coverdale to drop the gun and, as the gun dropped, it discharged into the front door. Based on this testimony, Smith requested a jury instruction on self-defense. The trial judge denied the request. We review *de novo* a trial judge's denial of a defendant's requested jury instruction.[5]

The law that applies to this case is clear. 11 *Del. C.* § 464(a) sets forth the defense of justification or, as it is often colloquially called, "self-defense." Thus, "[t]he use of force upon or toward another person is justifiable when the defendant believes that such force is immediately necessary for the purpose of protecting the defendant against the use of unlawful force by the other person on the present occasion." Under 11 *Del. C.* § 303(a), "[n]o defense defined by this Criminal Code or by another statute may be considered by the jury unless the court is satisfied that some credible evidence supporting the defense has been presented." We have recently concluded that a "defendant has submitted sufficient evidence to satisfy the credible evidence threshold [of § 303(a) ] for a self-defense instruction if the defendant's rendition of events, if taken as true, would entitle him to the instruction."[6]

---

5. *Lunnon v. State,* 710 A.2d 197, 199 (Del. 1998)

6. *Gutierrez v. State,* 842 A.2d 650, 651 (Del. 2003)

Smith argues that the trial judge's failure to give the requested justification instruction coupled with two other instructions the trial judge did give "usurped the jury's role to decide the facts" and "decid[ed] as a matter of law that the defendant was involved in a robbery."[7] In this case, the trial judge gave an accomplice liability instruction that he summarized as:

for the defendant, Michael R. Smith, to be liable as an accomplice, you must be unanimously satisfied beyond a reasonable doubt that the defendant, Michael R. Smith, when *intending to promote or facilitate the commission of the offense,* in some way either participated in the planning and/or commission of the crime or actively encouraged the other person to commit the crime either prior to or at the scene of the crime.... The mere presence at the scene of the crime does not establish accomplice liability.[8]

The trial judge also gave a "negative self-defense instruction": "Self-defense is not applicable as a defense to the offenses charged in the Indictment. Therefore, you may not consider self-defense as a defense to the offenses in the indictment." The trial judge did *not,* however, give another of the defendant's requested instructions, which according to the defendant, would have mitigated the effect of the other instructions. As defense counsel explained to the trial judge:

If you just instruct the jury that they cannot use [Smith's act of grabbing Coverdale's arm] ... the State cannot use that to establish any criminal liability on [Smith's] part that the grabbing of the arm and knocking the arm down in the vehicle I think resolve some of this problem.... Unless you instruct them, the jury can, based on that evidence that they have heard and the laws that you have given, they can find somehow Mr. Smith responsible for aiding and abetting, participating in this by somehow grabbing the arm because that facilitated Mr. DeShields even in the murder because, if not, Coverdale would be able to spin around and shoot first and possibly hit Mr. DeShields first.

In his reply brief on appeal, Smith summarized this same argument:

The problem exists if the jury believed that [sic] the defendant's version of events, which included him grabbing Mr. Coverdale's arm and knocking the gun out of Mr. Coverdale's hand. This clearly aided and abetted Mr. DeShields in his actions by preventing Mr. Coverdale from defending himself. Such conduct constitutes participation in the crime under the accomplice liability instruction.

We disagree with this position. The problem arises in this case because there are two competing theories of the case. Un-

7. Smith also extensively quotes the trial judge's rulings from the bench suggesting that the trial judge "seemed to direct a verdict that the defendant was in fact involved in the robbery, contrary to his testimony." We disagree. To the extent that the trial judge did not articulate properly the rationale for his decision, we can affirm on the basis of a different rationale. *See State v. Sloman,* 886 A.2d 1257, 1265 (Del.2005) (citing *Unitrin, Inc. v. American General Corp.,* 651 A.2d 1361, 1390 (Del.1995)).

8. This instruction applied to accomplice liability with respect to Count One of the indict-

ment. In addition to summarizing the accomplice liability law, the trial judge quoted the relevant portion of the statute and defined the second element the jury had to find beyond a reasonable doubt, in part, as: "The person alleged to be the accomplice acted intentionally; that is, he intended to promote or facilitate the commission of the offense charged." The trial judge gave a similar accomplice liability instruction for the felony murder charge, Count Three of the indictment, and for the remaining robbery and possession of a firearm during the commission of a felony charges.

der the State's theory, Smith was a knowing and willing participant in the robbery who pointed his gun at Coverdale's head in an obviously threatening manner. The State did not premise Smith's accomplice liability on Smith grabbing Coverdale's arm.[9] Smith was not entitled to a justification instruction under the State's theory of the case.[10]

 Thus, the narrow issue on appeal is whether, accepting Smith's version of the events as true and under his theory of the case, he was entitled to the justification instruction. We conclude that he was not. Under the accomplice liability instruction the trial judge gave, the jury could only find Smith liable as an accomplice if he acted *intentionally* by: "intend[ing] to promote or facilitate the commission of the offense." Smith's testimony provided no credible basis to conclude that he acted intending to promote or facilitate *any* offense. Rather, accepting Smith's version of the events as true, he was simply spending time with DeShields drinking and smoking marijuana. There was never any plan for a robbery or murder. DeShields and Smith only wanted to purchase some more marijuana from Coverdale after Smith's supply ran low. When Coverdale arrived, they got into the van to "smoke a blunt,"—what appeared to be a relatively innocuous activity in light of the events as they unfolded. DeShields began to threaten Blackwell. When Smith turned around he saw that DeShields had his gun pointed at Blackwell and then saw Coverdale reaching for a gun. As Coverdale turned with his gun, Smith hit Coverdale's arm intending to protect himself because he feared for his life and safety should Coverdale shoot into the back seat.

Smith's conduct simply does not amount to intentionally promoting or facilitating *any* offense charged in the indictment. As noted in the defendant's reply brief, ". . . Smith further also testified that the *only* reason he [grabbed Coverdale's arm] was *not* to aid and abet Mr. DeShields but was to prevent harm from occurring to himself."[11] As a matter of logic, the defense of justification has no place at all if, under the defendant's version of the facts accepted as true, the defendant has committed no crime for which he was charged. Smith was not charged with offensive touching for grabbing Coverdale's arm, nor did he act intending to promote or facilitate the robbery or murder. If the jury had believed Smith's version of the events, they would have returned acquittals on all charges.[12] Thus, Smith's appeal on this

**9.** As the prosecutor said in arguments before the trial judge: "We are not going to argue that Mr. Smith is criminally liable for grabbing Mr. Coverdale's arm. We are going to be up there arguing that Smith had the .32 in his hand with his finger on the trigger pointed at Coverdale. All this stuff about grabbing the arm, we are basically arguing never happened."

**10.** *See e.g., Tice v. State,* 382 A.2d 231, 233 n. 4 (Del.1977)("11 Del.C. § 464. . . may not be used where the defendant provoked the incident or can avoid the necessity of using deadly force."); *Quillen v. State,* 110 A.2d 445, 453 (Del.1955) ("Moreover, the State, if it had requested it, would have been entitled under the facts of this case to a charge that self-defense is not available to one who deliberately provokes the difficulty that makes the kill-ing necessary"); *State v. Stevenson,* 38 Del. 105, 109, 188 A. 750 (O. & T.1936) ("The general rule is that one who kills another, to be justified or excused on the ground of self-defense, must have been without fault in provoking the difficulty and must not have been the aggressor and must not have provoked, brought on, or encouraged the difficulty or produced the occasion which made it necessary for him to do the killing.")

**11.** Pg. 1, *Emphasis added.*

**12.** The jury returned guilty verdicts on four counts of Possession of a Firearm During the Commission of a Felony. As the trial judge instructed the jury, in order to find a defendant guilty of this offense the jury had to find, among other things, either that Smith aided DeShields's Possession of a Firearm During

ground must fail.[13]

### 2. Improper prosecutorial comment during closing arguments

 Smith claims that the prosecution made two improper remarks during his rebuttal summation. We review a claim of prosecutorial misconduct *de novo* to determine whether the conduct was improper or prejudicial.[14] "An improper remark by a prosecutor requires reversal of a conviction, however, only when it prejudicially affects substantial rights of the accused."[15] To determine whether an improper remark prejudicially affected the substantial rights of the accused we apply the four-factor *Hughes–Hunter* test considering: (1) the closeness of the case; (2) the centrality of the issue affected by the alleged error; (3) the steps taken to mitigate the effects of the error; and (4) whether the prosecutor's statements are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process.[16]

First, Smith contends that the prosecution improperly informed the jury that it was their duty to find the truth in the case and that this was a misstatement of the

---

the Commission of a Felony, or that Smith himself "possessed" a firearm, which means that defendant had "dominion, control, and authority, but a person is in possession of a firearm within the meaning of this section only when it is physically available to him during the commission of a crime." If the jury believed Smith's testimony, it is unlikely that they could have returned guilty verdicts on these counts. Hitting someone's arm and knocking a gun away is hardly "dominion, control, and authority" over that firearm. These verdicts assure us that even if Smith had been entitled to a justification charge based on his innocent-bystander-factual theory, that the failure to give the charge was harmless error. No reasonable jury could find Smith guilty of Possession of a Firearm During the Commission of a Felony and simultaneously conclude that he acted justifiably.

13. Smith contends that the trial judge's decision to give the "negative self-defense" instruction and his refusal to give the instruction that Smith's conduct in knocking the gun out of Coverdale's hand did not constitute a crime "further compounded the problem." Under the facts of this case, the trial judge did not err by giving the former instruction or by refusing the latter. The trial judge concluded that, "giving all the shooting back and forth, I'm going to tell the jury that self-defense is not available here. I'm not going to instruct the jury that pushing his arm away is not aiding and abetting.... I am not going to complicate things any further. I don't think there is any rationale basis for any of that stuff."

While the trial judge certainly would not have been required to give the negative self defense instruction, on these facts, it was not error for him to do so in an attempt to clarify the issues as he saw them and to prevent the jury from speculating about whether any party fired in self-defense (e.g., whether DeShields fired back at Coverdale because Coverdale fired at the van.) Similarly, having correctly concluded that he did not have to give the justification instruction, the trial judge properly concluded that he did not have to give the defendant's second requested instruction. In any event, defense counsel essentially made the point to the jury during his closing argument:

> [the] Judge ... did not tell you at any point that [smacking Coverdale's arm because he did not want Coverdale wheeling around and shooting] is enough for criminal responsibility. The State will not argue to you that that indicates any criminal responsibility, and it does not. I want to make sure that that point is out there. Obviously, if anybody disagrees, [the prosecutor] can come up and tell you that when he has rebuttal argument in a moment.

14. *Daniels v. State,* 859 A.2d 1008, 1011 (Del. 2004).

15. *Bugra v. State,* 818 A.2d 964, 966–967 (Del. 2003).

16. *Thompson v. State,* 2005 WL 2878167, *2, 2005 Del. LEXIS 423, *5–6 (Del.2005)(order) (citing *Hughes v. State,* 437 A.2d 559 (Del. 1981); *Hunter v. State,* 815 A.2d 730 (Del. 2002)).

law as it relates to reasonable doubt. The jury's actual duty, as Smith characterizes it, is to determine whether the State has established that the accused is guilty beyond a reasonable doubt. Second, Smith argues that the prosecutor improperly denigrated defense counsel by pointing out the "gall" the defense counsel had to comment in closing about one of the defense witness's testimony. With respect to Smith's first argument, we conclude that, in context, this comment did not misstate, disparage, or admonish the jury to disregard reasonable doubt as the standard of proof. With respect to the second argument, assuming that the "gall" comment was error, the trial judge's curative instruction sufficiently protected Smith from any prejudice stemming from that comment. The reasons for our conclusions follow.

### A. *Prosecutor's alleged misconduct by informing the jurors that their duty was to find the truth.*

The State began its rebuttal summation by discussing reasonable doubt:

[Defense counsel] spent a significant amount of time putting his chart up there about reasonable doubt and telling you what he thought beyond a reasonable doubt is. The Judge has already told you in instructions, and you will have them to read, and let me read a part of that to you. The Judge said in the instructions:

"There are very few things in this world that we knew with absolute certainty, the law does not require proof that overcomes every possible doubt."

What does the Judge tell you that proof beyond a reasonable doubt is? Proof that leaves you firmly convinced of the defendant's guilt. That is what it is. It is as simple as that. If you are firmly convinced by the totality of this evidence of the defendant's guilt, then you should find the defendant guilty.

[Defense counsel] also spends considerable time criticizing the State, saying that we want you to pick and choose. You know, the truth of the matter is that everybody has to pick and choose. The defense got up here and picked and chose ad nauseum among transcripts about what they wanted to show you. Yes, when we argue this case to you, we will pick and choose the evidence that shows this case is proven beyond a reasonable doubt. And you know what else? The Judge has already told you that when you are judging the credibility of the witnesses and looking at this case, you also are to pick and choose what you believe because in the instruction on credibility of witnesses and conflicts in testimony, he has told you—and you will see—that it is your duty to give credit to that portion of the testimony which you believe is worthy of credit and you may disregard that portion of the testimony which you do not believe to be worthy of credit.

And why is that? Because it is not your duty to accept everything that Mr. DeShields says or reject everything that Mr. DeShields says; to accept everything that Mr. Blackwell says or reject everything that Mr. Blackwell says; to accept everything that Mr. Smith says or reject everything that Mr. Smith says. *It is your duty to find the truth in this case. To look at the totality of the case, the case as a whole, to decide what you believe about this case and decide what the truth is.*

This is a trial. There are going to be things that conflict. There is a State's case and there is a defense case. There are things that conflict.[17]

Later the prosecutor, while discussing accomplice liability and apparently reading

---

**17.** The defendant claims that the italicized remarks were improper.

from the jury instructions again, related that: "In order to find a person guilty of an offense committed by another person, you must find that all of the following elements have been proven to your satisfaction beyond a reasonable doubt." Finally, at the end of his statement, the prosecutor said: "Yes, seventeen-year-old George Coverdale is dead. *You are to determine the truth in this case. Don't let the truth die with George Coverdale, ladies and gentleman.* Please use your common sense and do justice in this case under the law and the facts."

After the prosecutor was finished, defense counsel argued that the prosecutor misstated the law by wrongfully informing the jury of their nonexistent "duty to find the truth" and requested that the trial judge instruct the jury that they had no duty to find the truth, only a duty to decide whether the State has proven the case beyond a reasonable doubt. The trial judge did not give this instruction stating "I am not going to tell them not to find the truth."

■ It is clearly improper for a prosecutor to make a statement that admonishes the jury to disregard reasonable doubt as the standard of proof, disparages the reasonable doubt standard that governs the jury's determination of guilt, or misleads the jury about the State's burden of proof.[18] In *Thompson v. State,* we recently concluded that a comment the prosecutor made in rebuttal summation—"The State asks that you go back not seeking to find reasonable doubt, but to seek the truth..."—was clearly improper.[19] The comments in the case at bar, however, are factually distinguishable from those in *Thompson.*

■ Here the prosecutor first discussed reasonable doubt in detail by reading portions of the trial judge's jury instructions. Later, when discussing accomplice liability, the prosecutor properly stated the reasonable doubt standard. The bulk of the prosecutor's above-quoted statements followed the jury instructions on the function of the jury in determining the credibility of witnesses. In context, we think the prosecutor was attempting to convey the essence of the trial judge's instruction to "reconcile the conflicts" in the evidence "to make one harmonious story" of the events by giving credit to testimony worthy of credit and disregarding that which is not. Unlike in *Thompson,* the comments here did not admonish the jury to *disregard reasonable doubt* as the standard of proof. On the facts of this case, we cannot conclude that the prosecutor's isolated use of the statement "duty to find the truth", without more, intentionally or inferentially urged the jury to abandon reasonable doubt as the standard that governed their resolution of the charges.[20] Accordingly, in this case, we hold that the comments were not improper.[21]

18. *Thompson,* 2005 WL 2878167 at *2, 2005 Del. LEXIS 423 at *4 (order), *Hunter,* 815 A.2d at 732; *Boatswain v. State,* 2005 WL 1000565, 2005 Del. LEXIS 168 (Del.2005) (order).

19. *Thompson,* 2005 WL 2878167 at *2, 2005 Del. LEXIS 423 at *5.

20. *Compare Id.* It is interesting to note that in his opening statement defense counsel used language very similar to that now at issue: But one of the reasons we have juries is because, to a large extent, every one of you,

as you go about your day-to-day business, is acting just like a juror does. You are listening to people. "Is that person believable? Am I going to do something based upon what that person says?" You may not have been jurors in a whole lot of cases; you may not have been jurors at all, but you have common sense and experience to, hopefully, *let you see what the truth is here in this case.*

21. *See e.g., Burgess v. United States,* 786 A.2d 561, 571 (D.C.2001) ("[A]ppellant complains that the prosecutor improperly exhorted the

In future cases, the State and defense counsel should, however, err on the side of caution by avoiding language that couples the jury's resolution of conflicting or inconsistent testimony with a "duty to find the truth." It is very difficult to draw the line between a case like the one at bar and *Thompson*. It is better not to have to draw the line at all. Counsel can very easily use different language to make the same point about the jury's role in reconciling witnesses' conflicting testimony by determining the witnesses' relative credibility to make a "harmonious story of it all."

### B. Prosecutor's improper comment on defense counsel's "gall."

At trial, the State very effectively cross-examined one of the defendant's witnesses, Keith Nelson, showing that the statements he made on direct examination were inconsistent with certain evidence and contradicted by his statements on cross-examination. During his summation, defense counsel made reference to Nelson's testimony and how it helped the defendant and also pointed out many inconsistencies and contradictions in Blackwell's and DeShields's testimony. The prosecutor countered:

> I want to talk about inconsistencies in a case. The State put on a case here and the defense put on a case here. If you want to talk about an inconsistent case, they have called people like Mr. Keith Nelson to the stand. How in the world does he even have the gull [sic—"gall"] to talk about Keith Nelson when Keith

Nelson says it was a week to two weeks after? "I am positive it was seven days after the incident. I was talking to DeShields and Blackwell." This is on the outside.

Then on cross-examination, he starts saying, "Well, it was just DeShields." Then when he is told DeShields is in prison, "Well, no, I mean Blackwell. I was talking with Blackwell on the outside." Then we find out from the records that that is impossible because a week after this incident, Keith Nelson was in prison.

But they do have the [gall] to talk about Mr. Nelson in closing, and Mr. Nelson and some of these other people they bring to the stand, like the Godmother. They are telling you that there is a conspiracy between Mr. Blackwell and DeShields. They are the conspirators. They are the ones who are together...

After the prosecutor finished, defense counsel objected to the prosecutor's use of the word "gall," arguing that it was a denigration of the defendant's right to counsel. Defense counsel requested that the trial judge strike the "gall" comments and to "instruct the jury that, in fact, defense counsel not only has a right, but a duty to go ahead and comment upon the evidence." The prosecutor responded that he thought the "gall" comment was fair, and that, in any event, defense counsel repeatedly denigrated the prosecution in his summation. The trial judge concluded that both defense counsel and the prosecution had denigrated each other. Both

---

jury to seek the truth, which, he contends, led to a 'reduction in the government's burden of proof to some lesser standard closer to that required in a civil trial.' However, the prosecutor used the "truth seeking" theme to remind the jury of its role in deciding the facts and determining the credibility of the witnesses. This court has more than once referred to the "truth-seeking" function of the

jury and the trial"). *See also State v. Aleksey*, 343 S.C. 20, 26–29, 538 S.E.2d 248 (S.C. 2000); *United States v. Gonzalez–Balderas*, 11 F.3d 1218, 1223 (5th Cir.1994); *State v. Hunt*, 115 N.J. 330, 373, 558 A.2d 1259 (N.J.1989) (discussing the trial judge's use of "seek the truth" language or its equivalent in instructions to the jury.)

sides "personalized this in a way that I am somewhat uncomfortable with." [22]

In light of defense counsel's objection to the prosecution's use of the word "gall," defense counsel's request for a curative instruction, and the trial judge's finding that defense counsel also denigrated the prosecution during his closing arguments, the trial judge instructed the jury:

> During the closing arguments, the attorney for the State, [name omitted], and the attorney for the defense, [name omitted], in their respective closings in-

voked the name of the other counsel. One talked about the other. I am going to tell you to disregard those personalized references.... It is up to you to base your decision in this case solely on the evidence that you have heard. It is up to you to find the facts of this case based on that evidence and apply the law, as I told you, to the facts as you find them to reach your conclusions about this case. That is your job.

The trial judge then reread the sympathy instruction he gave previously.

---

**22.** A lamentable conclusion, indeed. The trial judge may have been referring to the following statements of defense counsel. At the beginning of the argument, Defense counsel made specific references to both of the prosecutors, telling the jury:

> So when you go back in that room and deliberate on this case, the first question you have to ask is, "[Second prosecutor], why do you run away so quickly from what [First prosecutor] can't run away from in opening statement [sic]? He got up and said, "We expect to call these witnesses and this is what the case is going to be about." You know the reason why they ran away from that.

Defense counsel later asked the jury if they could remember the "glee on the State's face when they cross-examined Mr. Dismuke and Mr. Nelson." At another point, defense counsel sarcastically made reference to a "prosecutor world":

> So, obviously, in a prosecutor world, you cannot go socialize with people whom you haven't seen recently, with old friends, or with people who are even related to your sister... You are not allowed to go ahead and do that. Well, again, I guess in a prosecutor world, nobody ever looses [sic] keys or looses [sic] items and then finds them in the most obvious place which they first were.

Other statements of defense counsel that the trial judge may have had in mind include:

> But the State wouldn't want you to find that Mr. DeShields is telling the truth about this. Don't you remember how the rules are able to be twisted?
> Do you think the State is going to get up here and say in rebuttal, "Yeah, our wit-

nesses lied?" Do you think that is going to happen?

Defense counsel also apparently pointed out the defendant's family in an attempt to evoke sympathy for the defendant at least five times during his closing argument. After defense counsel finished his closing argument, the prosecutor put this fact on the record. Defense counsel did not correct the prosecution's characterization of these facts, nor did the trial judge.

At a hearing held the day after the closing arguments, outside of the presence of the jury, the prosecutor attempted to supplement the record with things that defense counsel did during closing argument that were not reflected in the record. Particularly, the prosecutor again noted that defense counsel attempted to evoke sympathy on behalf of the defendant by pointing to the defendant's family. The prosecutor also noted that defense counsel made negative comments about the prosecution's presentation of the case: "[defense counsel] specifically turned away from the jury and [turned] to [the prosecutors] and said, 'Right?' "Isn't that right?' In other words, addressing us rather than the jury...." Defense counsel objected that this did not accurately present the record in the case and that this was the wrong manner of creating a record. The trial judge, who was better situated to observe defense counsel's conduct during the trial than are we, noted:

> I think, frankly, [defense counsel] you belittled the prosecution at times in this case. It is certainly fair to comment on whether or not you think their case was successful or unsuccessful, but you can do it in a more positive and professional manner. I do not want to have any more of that. I am tired of it. It was unprofessional.

██ On appeal, Smith claims that the "gall" statement inappropriately denigrated and discredited his defense counsel. It is well-settled that a prosecutor may not use summation as an opportunity to denigrate the role of defense counsel or the defensive strategy employed, or to discredit defense counsel in front of the jury.[23] "Arguments by the prosecutor to the jury ... should focus on *evidence* introduced at trial rather than on his or her opinion of defense counsel's personality or trial strategy."[24] "[S]ubsequent jury instructions to rectify that type of error *may* not ensure that [such] disparaging remarks have not already deprived the defendant of a fair trial."[25]

The State assumes that the prosecutor's "gall" comments were improper. The State argues, however, that the comments were essentially an invited response to defense counsel's "repeated denigration of the prosecutors during his summation" and that, considered in this context and given the trial court's curative instruction, the prosecutor's comments "neither resulted in any unfair prejudice to Smith nor undermined the reliability of the jury's verdict."

 An improper remark by a prosecutor requires reversal of a conviction only when it prejudicially affects substantial rights of the accused.[26] In this case, we agree that the prosecutor's comment was improper. Given the context, however, it was not highly improper or egregious. Applying the four factors of the *Hughes–Hunter* test, we conclude that the prosecutor's isolated "gall" comment did not prejudicially affect Smith's rights.

Although one could argue that this was a close case[27] and the prosecutor's "gall" statement repeated an error that we have previously admonished, in context, the isolated misconduct was not egregious, did not have a significant prejudicial impact, and did not affect a central issue in the case.[28] Smith's credibility was the lynchpin for resolving the central issue in the case: whether Smith was a participant in the robbery or whether he was an innocent bystander. The "gall" comment related to defense counsel's statements during defense counsel's summation and only indirectly served as a preface to a proper attack on Nelson's credibility, a witness whose credibility had already been impaired by an effective cross-examination.[29] What is more important to our analysis of the *Hughes–Hunter* factors is that the trial judge gave the jury a curative instruction that eliminated any possible prejudicial impact of the statement. "This Court has repeatedly held that even when prejudicial error is committed, it will usually be cured by the trial judge's instruction to the jury to disregard the remarks."[30]

**23.** *Hunter,* 815 A.2d at 735; *Walker v. State,* 790 A.2d 1214, 1218–20 (Del.2002).

**24.** *Walker,* 790 A.2d at 1220 (emphasis in original).

**25.** *Id.* (emphasis added and quotation omitted).

**26.** *Bugra,* 818 A.2d at 966–967.

**27.** Once the jury made its credibility determination and chose to believe DeShields's and Blackwell's testimony over that of Smith, it was certainly no longer a close case. *See e.g., Johnson v. State,* 1994 WL 496469, *3, 1994 Del. LEXIS 272, *7 (Del.1994)(order) ("[T]he case was not close once the jury made its assessment of the witnesses' credibility.")

**28.** In our view, the defense witnesses, given their own credibility issues, offered the jury little to aid in their assessment of Smith's credibility.

**29.** Insofar as the comment related to the Godmother it was entirely improper; but, after reviewing the relevant testimony, we find that the comment caused minimal prejudice, if any.

**30.** *Pennell v. State,* 602 A.2d 48, 52 (Del.1991) (citing *Kornbluth v. State,* 580 A.2d 556, 561 (Del.1990); *Brokenbrough v. State,* 522 A.2d

Smith contends that the curative instruction in this case was insufficient because it was "vague and neutral" and did not refer to "the specific improper statements of the prosecutor." We disagree. While we do not find it necessary to reach the State's invited response argument, the trial judge clearly concluded that defense counsel made several unprofessional statements that belittled the prosecution during his summation. The record supports his view. In that context, the trial judge carefully crafted his curative instruction, which informed the jury to disregard personalized references that both defense counsel and the prosecutor made, and to base their decision solely on the evidence.[31] "Trial judges are in the best position to observe the impact of improper statements at the time they are made, to determine the extent to which they may have affected the jury or the parties, and to remedy any ill effects."[32] We must presume that the jury heeded the trial judge's instructions.[33] Thus, under the circumstances, the curative instruction mitigated any possible prejudice.

**3. *The trial judge's alleged error by denying Smith's Motion for a Mistrial when the prosecutor elicited inadmissible testimony that Smith was incarcerated***

At trial the defense called Duane Dismuke, Smith's friend, to testify about a conversation that he had with DeShields in prison. Dismuke stated "[DeShields] told me to tell Michael Smith that if [Smith] don't [sic] help him get a lawyer, that he is going to bring [Smith] down." Moreover, DeShields told Dismuke that Smith had nothing to do with the shooting.

Before the prosecutor began cross-examining Dismuke, the prosecutor informed the trial judge that he wanted to question Dismuke about his last conversation with Smith. The trial judge expressed concern because Smith and Dismuke were incarcerated together, and the trial judge did not want the jury to know that Smith was incarcerated. The prosecutor responded that he would not ask Dismuke "where", but only "when" he last spoke with Smith. The trial judge then told Dismuke not to tell the jury that he talked to Smith in prison.

The prosecutor, attempting to attack Dismuke's credibility, questioned Dismuke about waiting for six or seven months to relay DeShields's message to Smith:

Q: And when you got out [of jail in May 2003], Mr. DeShields had already asked you to communicate this message, correct?

A: Yes.

Q: Well, why didn't you communicate it when you got out of jail in May of 2003?

A: He[Smith] was incarcerated. How could I tell him? I was home.

After Dismuke's response, the trial judge called counsel to side bar. Defense counsel moved for a mistrial, arguing that the

851, 857 (Del.1987); *Diaz v. State,* 508 A.2d 861, 866 (Del.1986)).

**31.** At that point in the trial, "evidence" was essentially a defined term. In his earlier instructions, the trial judge informed the jury that "what an attorney states in his or her opening or closing arguments is not evidence. Evidence consists of testimony from the witness stand and exhibits introduced through their testimony. It is this evidence only which you may consider in reaching your verdicts."

**32.** *Thompson,* 2005 WL 2878167, *3, 2005 Del. LEXIS 423, *9 (Del.2005) (quoting *Adams v. Luciani,* 2003 WL 22873038, 2003 Del. LEXIS 587 (Del.2003)).

**33.** *Johnson v. State,* 878 A.2d 422, 426 (Del. 2005) (citations omitted); *Hendricks v. State,* 871 A.2d 1118, 1123 (Del.2005) (citations omitted).

prosecutor intentionally elicited inadmissible evidence. The prosecutor informed the trial judge that he simply was confused about the dates. The trial judge rejected defense counsel's suggestion that the prosecutor acted intentionally, stating: "The record never reflects how your face looks, but you have convinced me that you certainly did not do that purposely...." The trial judge then denied the Motion for a Mistrial and instead gave a curative instruction.[34]

 On appeal, Smith argues that the trial judge erred by denying his Motion for a Mistrial. Smith claims that the prosecutor's intentional elicitation of Dismuke's inadmissible testimony coupled with the fact that the jury *venire* saw Smith in handcuffs before trial,[35] substan-

tially prejudiced him and denied him his right to a fair trial.[36] "A trial judge should grant a mistrial only where there is a 'manifest necessity' or the 'ends of public justice would be otherwise defeated.'"[37] Furthermore, a mistrial is "mandated only where there are 'no meaningful and practical alternatives' to that remedy."[38] "The trial judge is in the best position to assess whether a mistrial should be granted, and may exercise his discretion in deciding whether to grant a mistrial."[39] Absent an abuse of that discretion, we will not disturb the trial judge's decision.[40]

 We first discuss Smith's claim that significant prejudice resulted, requiring a mistrial, because the jury *venire* saw Smith in handcuffs.[41] In *Duonnolo v. State*,[42] we held that a jury *venire's* view-

34. The trial judge gave the following curative instruction:
Ladies and gentlemen, there was an objection to the last question and the last answer given by the witness. I have sustained that objection. Therefore, you should disregard it. It should not play any role in your deliberations or your considerations.
I will also tell you that I believe the witness may have testified at that time that Mr. Smith was incarcerated at some time in 2003. You should disregard that. That should play no part at all in your considerations for your deliberations of the charges in this case. It has been stricken from the record.

35. During the jury selection process and while the jury *venire* was in the courtroom, a correction officer transported Smith from the courtroom in handcuffs. Smith has presented no evidence indicating that any members of this *venire* actually saw the handcuffs. Moreover, the record does not reflect that any seated juror was among those in the *venire* who may have seen Smith in handcuffs.

36. Smith suggests that we should engage in a *Hughes* analysis to determine the prejudicial affect of Dismuke's testimony because the prosecutor intentionally elicited inadmissible evidence. The trial judge found that the prosecutor simply made a mistake and Smith has provided no evidence to suggest that the trial

judge's finding was clearly erroneous. Therefore, we accept the trial judge's factual finding that the prosecutor made a mistake.

37. *Hendricks v. State*, 871 A.2d 1118, 1122 (Del.2005)(quoting *Steckel v. State*, 711 A.2d 5, 11 (Del.1998)).

38. *Ashley v. State*, 798 A.2d 1019, 1022 (Del. 2002) (quoting *Dawson v. State*, 637 A.2d 57, 62 (Del.1994)).

39. *Bowe v. State*, 514 A.2d 408, 410 (Del. 1986). *See also Sawyer v. State*, 634 A.2d 377, 379 (Del.1993)( The abuse of discretion standard "takes into consideration the trial judge's unique perspective in gauging the impact of the allegedly prejudicial conduct in the trial setting.").

40. *Id.*

41. It is worth noting that Smith never sought a curative instruction or a new *venire* after the *venire* saw him in handcuffs. Arguably Smith has waived any appeal on these grounds. Smith now attempts to couple this argument with another argument that he did preserve for appeal.

42. 397 A.2d 126, 130–31 (Del.1978)(citing *Brookins v. State*, 354 A.2d 422, 425 (Del.1976)("Indeed, it is generally held that

ing of the defendant in handcuffs, by itself, does not amount to reversible error.[43] Smith has failed to articulate how the jury *venire's* brief, incidental viewing of Smith in handcuffs caused any prejudice. Smith also cannot demonstrate that any members of the *venire* who saw Smith in handcuffs were actually seated on the jury.

 Smith attempts to distinguish his case from *Duonnolo* by arguing that the jury *venire* not only saw him in handcuffs, but the actual jury also heard testimony from Dismuke about Smith's incarceration. This argument lacks merit. We cannot find that Dismuke's testimony exacerbated any prejudice to Smith because the trial judge gave a curative instruction, which defense counsel crafted, immediately after Dismuke testified about Smith's incarceration. We have consistently held that "even when prejudicial evidence is admitted, its prompt excision followed by a cautionary instruction will usually preclude a finding of reversible error."[44] We are satisfied that the trial judge's prompt curative instruction blunted any prejudice resulting from Dismuke's testimony about Smith's incarceration. The curative instruction was an adequate, practical, and meaningful alternative to granting a mistrial.[45] Therefore, no manifest necessity for a mistrial existed and the trial judge properly acted within his discretion.

### 4. *The trial judge did not abuse his discretion by failing to grant a mistrial after concluding that the State committed a discovery violation*

According to the State's theory of the case, Smith was armed with a .32 automat-

ic handgun, DeShields had a .357 magnum revolver, and Coverdale had a .38 caliber snub nose revolver, which the police recovered at the crime scene. Supported by DeShields's testimony, the State argued that Smith fired a shot at the fleeing Coverdale that missed and hit the driver's side front door. Coverdale fired back, hitting the van with the .38 caliber bullet found in the middle seat of the van. The parties stipulated that DeShields fired the .38 caliber bullet that killed Coverdale from a .357 magnum.

The State tried and convicted DeShields before the beginning of Smith's trial. At DeShields's trial, the State's firearms expert, Marsanopoli testified that the .32 caliber bullet found in the driver's door would have been fired from a .32 automatic, not a .32 revolver. At a suppression hearing held before the start of Smith's trial, Blackwell testified that Smith had a "chrome revolver" at the time of the incident. During cross-examination at Smith's trial, he repeated this testimony.

The State called Marsanopoli to testify at Smith's trial. On cross-examination of Marsanopoli the following exchange occurred:

Q: What you are telling us here today is that you examined three bullets; right?

A: Yes, that's correct.

Q: And in your opinion, those three bullets came from three different guns?

A: That is correct.

---

there is no reversible error if members of the jury view a defendant in handcuffs when he is in custody outside the courtroom itself or while he is being transferred to and from the courtroom.")).

**43.** *See also Slater v. State,* 1995 WL 89955 (Del.Supr. Mar. 1, 1995)

**44.** *Sawyer,* 634 A.2d at 380 (citing *Pennell v. State,* 602 A.2d 48, 52 (Del.1991)).

**45.** *See Ashley v. State,* 798 A.2d at 1022, n. 15 (citing *Ney v. State,* 713 A.2d 932 (Del.1998)) ("stating that 'in certain cases a cautionary instruction is a 'meaningful and practical' alternative obviating the need for a mistrial.' ")

Q: The one that was given to you as 04–6177 Delaware State Police number—

A: Yes.

Q: —is also identified as the bullet from the door; is that correct?

A: I don't know where it was submitted from. I just get the number on it.

Q: That is consistent with coming from a .32 automatic; correct?

A: It is compatible with being fired from a .32 automatic, yes.

Q: It is not compatible with being fired from a .32 revolver, though?

A: It could have been fired from a .32 revolver, but it is compatible with being fired from a .32 automatic, as well as a .32 revolver.

Q: Didn't you testify in Mr. DeShield's trial?

A: I believe I did.

\* \* \*

Q: And do you remember—and this is on Page 135 for the State's reference—you are being asked, "Is that only an automatic?," and you answer being, "Yes," and then the question, "And can you tell us how you know that was fired—well, withdraw that. Not a .32 revolver then; is that correct?," and you answer is, "No. It would have been fired by a firearm that has a caliber for a .32 automatic... it would have been fired from a gun that is a .32 automatic, and those are pistol firearms." Do you recall testifying to that?

A: Yes.

Q: Is that correct testimony?

A: No, it was not.

Q: Why did you make that mistake? Do you have an explanation as to why you made that mistake?

A: At the time, I did believe it was fired from a .32 automatic and it was fired from an automatic. After I did testify to that, I went back and reviewed my notes and I took the .32 automatic cartridge and actually fired it from a .32 Smith and Wesson revolver as well as .32 HR Magnum—

At this point defense counsel asked to approach. He informed the court that he was not supplied with any information or notes on the additional test the State's expert performed. According to defense counsel, this was a new opinion that came as a complete surprise. Defense counsel then requested a mistrial based on the State's failure to update their discovery. During arguments to the trial judge, the prosecutor informed defense counsel and the judge that he never asked Marsanopoli to do any retesting. On *voir dire* outside of the presence of the jury, in response to defense counsel's questions, Marsanopoli testified that she did the additional testing the day before on her own initiative (not at the State's request). Marsanopoli reviewed her notes in preparation for Smith's trial and wondered about the .32 caliber bullet and whether she could testify that it was fired from a revolver or not. To resolve this issue in her own mind, she test fired the gun. After determining that the .32 caliber bullet could have been fired from a revolver, she called the prosecutor and told him her recent conclusion.

The trial judge ultimately concluded that the State committed a discovery violation by failing to inform defense counsel that the prosecutor had the oral results of Marsanopoli's retest before the next day of trial began.[46] He denied defense counsel's

---

**46.** The State does not challenge this conclusion on appeal. Before the trial judge there was a great deal of argument about whether Superior Court Criminal Rule 16(a)(1)(D) covered test results that were "oral statements" or whether the rule is "limited to tangible

motion for a mistrial and proposed to remedy the violation by holding the State to the theory that the bullet came from a .32 automatic. Defense counsel asked to be heard on a curative. After discussion, defense counsel and the prosecution agreed to strike Marsanopoli's testimony concerning the possibility of the .32 bullet being fired from a revolver and to stipulate to the fact that the .32 caliber bullet that was recovered in the door was fired from a .32 automatic. When the jury came back the trial judge gave the following instruction:

> Miss Marsanopoli testified that it was possible that the .32 caliber bullet found inside of the driver's door of the van came from a .32 caliber revolver. I am going to direct you to disregard that testimony. It has been stricken from the record. It should not play any part in your consideration or your deliberations in this case.
>
> I will tell you that the State and the defense have stipulated and agreed that

the .32 caliber bullet found inside the driver's door of the van came from a .32 caliber automatic weapon. When I say that somebody has stipulated and agreed to a particular fact, that means that you must accept that fact to be true.

> Normally, you are the finder of fact based on all of the evidence that you hear. Whenever the State and the defendant stipulate and agree to some particular fact, you must accept it to be true.[47]

 Smith now appeals arguing that the trial judge abused his discretion by failing to grant a mistrial after finding that the State committed a discovery violation by failing to disclose the results of Marsanopoli's retest of the .32 caliber bullet. We review a trial judge's denial of a motion for a mistrial for abuse of discretion.[48] It is well-settled in Delaware that a mistrial is mandated only where there are no meaningful and practical alternatives to

---

results, written reports... things that can be visually viewed..." The relevant section of the rule provides that:

> Upon request of a defendant the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the state, and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial.

The express language of the rule seems to require some type of writing. It is hard to "inspect and copy or photograph" results in the form of oral statements. Nevertheless, defense counsel's argument seems persuasive. He argued to the trial judge that if this section of the rule did not cover oral test results, then the defendant would never get anything because the State would simply have all of its experts give oral reports of test results. Because the State did not argue this issue and seems to concede it, we do not actually need to resolve it. We can assume that the trial judge's decision that the state was obligated to turn over the oral test results was correct.

**47.** In his jury instructions, the trial judge re-emphasized this point noting that "In this case, the parties have stipulated to certain facts. A stipulation that is in evidence is an agreement by both sides that those facts giving rise to the stipulation require no further proof. You must accept these facts as true for purposes of this trial."

**48.** *Starling v. State*, 882 A.2d 747, 755 (Del. 2005) (citing *Taylor v. State*, 827 A.2d 24, 27 (Del.2003)). This abuse of discretion standard of review for the denial of a motion for a mistrial coincides with the trial judge's "broad discretion in determining the appropriate sanction for a discovery violation." *See DeJesus v. State*, 655 A.2d 1180, 1207 (Del.1995), *See also Cabrera v. State*, 840 A.2d 1256, 1259 (Del.2004) ("The Superior Court has broad discretion to fashion remedies for discovery violations."); *See also* DEL. SUPER. CT. CRIM. R. 16(d)(2) "if at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule ... it may [among other things] enter [an] ... order as it deems just under the circumstances."

that remedy.[49] Moreover, a "trial judge is in the best position to assess whether a mistrial should be granted"[50] and should grant a mistrial only "where there is a 'manifest necessity' or the 'ends of public justice would be otherwise defeated.'"[51]

Defense counsel expected Marsanopoli to testify that the bullet in the driver's door could only have come from a .32 automatic, not a revolver. Using this testimony, he expected to be able to show that Blackwell's testimony that Smith had a revolver was inconsistent with the physical evidence so much so that it was "impossible" in addition to being blatantly inconsistent with DeShields's testimony. In short, defense counsel would have been able to persuasively argue that the State's expert witness's testimony indicated that Blackwell wrongly asserted that Smith had a revolver. Smith contends that the stipulation was insufficient to cure the prejudice that resulted from Marsanopoli's answer, specifically arguing that, "a stipulation of fact which overrides testimony that was already given cannot possibly sit well with the jury, or be as effective as if the witness would have testified consistent with ... her prior testimony." Marsanopoli's answer to defense counsel's question allegedly resulted in "defense [counsel] unintentionally [giving] Mr. Blackwell credibility." We disagree. Smith's defense was only marginally prejudiced, if at all, by these events. The parties stipulated that the bullet in the door came from a .32 automatic. The stipulation was a practical and meaningful alternative to a mistrial. With this stipulation on the record, defense counsel was able to argue that the State agreed that the .32 caliber bullet found in the door could not have come from a revolver.[52] If anything, this slightly strengthened Smith's argument that Blackwell was incorrect in asserting that Smith had a revolver. Moreover, we must presume that the jury followed the trial judge's instructions to accept the stipulated facts as true.[53] The trial judge did not abuse his discretion by failing to grant a mistrial. Accordingly, we find no merit to Smith's appeal on this issue.[54]

### 5. The trial judge's alleged error by prohibiting defense counsel from using the word "lie" in opening statements and when cross-examining the State's two primary witnesses

During opening statements defense counsel suggested that DeShields and

---

**49.** *Ashley v. State*, 798 A.2d 1019, 1022 (Del. 2002) (quotations omitted) (citing *Dawson v. State*, 637 A.2d 57, 62 (Del.1994)).

**50.** *Id.* (quoting *Bowe v. State*, 514 A.2d 408, 410 (Del.1986)).

**51.** *Hendricks v. State*, 871 A.2d 1118, 1122 (Del.2005).

**52.** In his closing, defense counsel did so:
Mr. Blackwell says one shot. He says it was a revolver. One shot fired by Mike Smith. Under the State's theory, the only way they are going to fit it in is somehow Mike Smith fired into the door. It has been stipulated, it has been agreed—and Judge Bradley told you that you have to find—that a revolver could not have put that bullet in the door. It has to come from an automatic. So if you are going to believe Mr. Blackwell that Mike Smith had a revolver, his testimony is inconsistent with what we know is agreed-upon evidence.

**53.** *See Johnson*, 878 A.2d at 426.

**54.** We have also considered whether the State's failure to disclose the test results was a *Brady* violation. Given the exchange between defense counsel and Marsanopoli on cross-examination, we think the information was arguably impeaching evidence that the prosecution should have turned over to the defense. Nevertheless, based on the above, we must conclude that there is "no a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Starling v. State*, 882 A.2d 747, 756 (Del.2005) (citing *Jackson v. State*, 770 A.2d 506, 516 (Del. 2001));

Blackwell were lying because they gave inconsistent stories about Coverdale's murder. Defense counsel stated: "And when people lie, when people don't tell the truth about things, they not only get contradicted by other people and by known facts, if we are lucky, like we are in this case, but...." The prosecutor then objected, stating: "you are not to stand up there and call the other side's witnesses liars or suggest that they lie and say the word lie...." The trial judge sustained the objection and instructed the defense to say "truthful" or "untruthful." Moreover, the trial judge gave the following curative instruction to the jury:

> Ladies and Gentlemen, the State had an objection. The objection was to the use of the word "lie" or "liar." I have sustained that objection. Those are inflammatory terms that we do not use. [The defense attorney] certainly may talk about whether or not somebody was truthful or not truthful, and ultimately, it is up to you to decide whether or not somebody was truthful or not truthful or confused or not confused or mistaken or not mistaken. That is within your purview."

Before DeShields testified, defense counsel again asked the trial judge to reconsider his ruling on the usage of the words "lie" or "liar." Defense counsel wanted to use these words when cross-examining DeShields. The trial judge again ruled that the words "lie" and "liar" could not be used, and that defense counsel should use the words "truthful" and "untruthful."

The trial judge yet again revisited the issue immediately before closing arguments. Defense counsel again wanted to use the words "lie" and "liar" in closing arguments when he discussed some of DeShields's and Blackwell's testimony. The trial judge, citing *Clayton v. State*,[55] determined that during closing arguments an attorney may "refer to testimony or statements as a lie and a person as a liar only (1) if one may legitimately infer from the evidence that the statement is a lie, and (2) if the [attorney], be it the prosecution or defense counsel, relates his argument to specific evidence which tends to show that the testimony or statement is a lie." After this ruling, defense counsel expressed concern because the ruling was inconsistent with the trial judge's previous instruction to the jury about defense counsel's improper use of the word "lie" during opening statements. Defense counsel believed that the trial judge should give a curative instruction so that the jury did not think that defense counsel was ignoring the trial judge's previous ruling. The trial judge agreed and told the jury that an attorney may argue in closing that a witness lied while testifying.

■ Smith now argues that the rule in *Clayton*, a rule permitting the prosecution to use the word "lie" in closing arguments if certain requirements are met, also applies to defense counsel's use of the word "lie" during opening statements and cross-examination, and, therefore, the trial judge erred by prohibiting defense counsel from using the word "lie" during opening statements and cross-examination of DeShields and Blackwell.[56] Smith contends that this

**55.** 765 A.2d 940, 943 (Del.2001). We note that the rule in *Clayton* was first adopted in *Hughes v. State*, 437 A.2d 559, 571 (Del.1981).

**56.** It is worth noting that defense counsel did not mention the *Clayton* rule when he sought to use the word lie in opening statements and during cross-examination. Defense counsel first mentioned *Clayton* when he sought to use the word "lie" in closing arguments. We recognize that defense counsel probably did not have an opportunity to present the *Clayton* rule to the trial judge when the State objected during opening statements. However, defense counsel revisited the issue before DeShields took the stand. At this time, defense counsel certainly could have brought the *Clayton* rule to the Court's attention.

error denied him a zealous defense because the trial judge's ruling undercut his ability to show that DeShields and Blackwell were less than credible witnesses. Whether the rule in *Clayton* applies to opening statements and cross-examination is a question of law and we review the issue *de novo.*[57]

We decline to address whether the *Clayton* rule applies to defense counsel during opening statements and cross-examination because it is not necessary to our holding. Instead, *for the sake of argument,* and leaving the precise issue to another day, we will assume that *Clayton* applies to both, and also assume that the trial judge erred by prohibiting defense counsel from using the word "lie" until closing arguments.[58] Even assuming error, we find that the error was harmless beyond a reasonable doubt.

Smith's argument is that he was denied a zealous defense because DeShields's and Blackwell's credibility was central to the State's case, and the trial judge's ruling limited Smith's ability to effectively undermine their credibility because using the word "untruthful" is less effective than using the word "lie." This argument lacks merit. Smith had an opportunity to attack DeShields's and Blackwell's credibility. Defense counsel vigorously crossed DeShields and Blackwell and was able to demonstrate that they both were "untruthful."[59] Certainly defense counsel's cross-examination was not less effective merely because he was required to say "untruthful" rather than "lie." Moreover, during

closing arguments defense counsel was able to rehash DeShields's and Blackwell's testimony and describe the "untruthful" portions as "lies." Therefore, even assuming that the trial judge erred, Smith suffered no conceivable prejudice because he had every opportunity to demonstrate that DeShields and Blackwell lacked credibility.

### 6. Trial judge's alleged errors in excluding evidence of one of DeShields's prior armed robberies and in curtailing Smith's cross-examination of DeShields

DeShields allegedly committed an armed robbery in April 2000. As Smith characterizes it—for purposes of this appeal, we will assume his characterization of the facts is correct—"the armed robbery...had such a great similarity to the crime he committed in 2003 [Coverdale's murder] that it was a fingerprint crime." According to Smith, while with an accomplice:

On each of these two occasions [DeShields] set up a drug deal. He ... used the same place to begin the contact, Deluxe Diary Market. Each of the events occurred in a van. On each occasion he waited until all the people were present in the van and then pulled out a gun. The gun was a handgun on each occasion. On each occasion ... DeShields actually had money but chose not to use that to buy the drugs. On each occasion ... DeShields chose to steal drugs. On each occasion ... DeShields

---

**57.** *See Hughes,* 437 A.2d at 571.

**58.** We do take note of the State's position that the *Clayton* rule would be difficult to apply to opening statements because the rule requires the attorney to "relate his argument to specific evidence which tends to show that the testimony or statement is a lie" and opening statements take place before the admission of any evidence.

**59.** Ten pages of Smith's brief on appeal are devoted to citing portions of DeShields's and Blackwell's testimony where defense counsel was able to demonstrate that their testimony was untruthful, inconsistent with their prior statements, inconsistent with each other, or inconsistent with the physical evidence.

chose to steal a necklace from the victim.

In his attempt to inform the trial judge of further facts relating to the incident, the prosecutor read from a summary of what appears to be a police interview with DeShields in which DeShields described the 2000 incident. In the 2000 incident, it appears that DeShields also had an accomplice, but that no one had a gun. Apparently, the victim of the alleged robbery refused to cooperate with the State, did not appear at the trial, and the state consequently entered a *nolle prosequi* on the charges against DeShields arising out of the incident.

Before Smith's trial, the State filed a motion *in limine* to prohibit Smith from offering into evidence information pertaining to DeShields's 2000 arrest for robbery. Smith argued before the trial judge, and again argues on appeal, several different reasons why evidence relating to DeShields's 2000 incident should have been admitted. The trial judge ultimately concluded that Smith could not introduce evidence of the incident or inquire into it on cross-examination of DeShields.

On appeal, Smith offers four reasons that he should either have been able to introduce evidence of DeShields's 2000 arrest for robbery or inquire into the arrest on cross-examination. We will discuss each argument in turn.

### A. *DeShields's 2000 arrest for robbery was a fingerprint crime admissible to show that another person committed the crime for which Smith was on trial*

█ Before the trial judge, Smith made this argument under D.R.E. 404(b), the "other crimes" provision of the evidence rule, contending that the 2000 crime showed that DeShields had a modus operandi of committing these types of drug robberies and that DeShields's arrest for the 2000 incident shows that someone else committed the crime for which Smith was on trial. D.R.E. 404(b) provides that that evidence of prior wrongs, crimes or acts, while generally inadmissible "to prove the character of a person in order to show action in conformity therewith," may be admissible for other purposes, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." This list is illustrative and "inclusionary." [60] In order to be admissible, "evidence of prior bad acts 'must be logically related to the material facts of consequence in the case.' " [61]

---

60. *Pope v. State*, 632 A.2d 73, 76 (Del.1993) ("[T]he list of exceptions is not exhaustive of potentially admissible evidence.") (citing *Getz v. State*, 538 A.2d 726, 730–31 (Del.1988)).

61. *Dollard v. State*, 838 A.2d 264, 267 (Del. 2003) (quoting *Getz*, 538 A.2d at 731). In *Dollard*, we stated that the 5–factor *Getz* test applied in a case where the defendant sought to admit evidence of one of the State witness's prior drug convictions. The State's witness was with the defendant when he was arrested and ultimately entered into a plea with the State. The defendant argued that the evidence was relevant to the State witness's intent to possess the drugs for which the defendant was indicted with having possessed with intent to distribute. We concluded that evidence of the State witness's prior bad acts did not relate to a material fact in the case and,

therefore, was properly excluded at the defendant's trial. *See also Tice v. State*, 624 A.2d 399 (Del.1993).

Many other courts have discussed circumstances where a defendant sought to introduce so-called "reverse 404(b) evidence." As the Seventh Circuit has stated, "Rule 404(b) of the Federal Rules of Evidence is typically used by prosecutors seeking to introduce evidence of a criminal defendant's prior misconduct as proof of motive or plan to commit the crime at issue. [citation] However, a defendant can seek to admit evidence of other crimes under this rule if it tends to negate the defendant's guilt of the crime charged against him. [citation] This is commonly referred to as reverse 404(b) evidence." *United States v. Seals*, 419 F.3d 600, 606 (7th Cir.2005). The protections of 404(b) generally apply to pre-

 The trial judge analyzed this argument under D.R.E. 404(b) and concluded that:

> as to whether ... Smith is guilty or not or as to whether or not Shane DeShields is telling the truth or not about what happened in 2003, the 2000 charges against DeShields ... mean absolutely nothing. The fact that the 2000 charges and the 2003 charges are similar proves nothing under a 404(b) analysis involving the charges against ... Smith.

We review a trial judge's evidentiary rulings for an abuse of discretion.[62]

 On appeal, Smith again argues that the evidence of DeShields's 2000 crimes is admissible to show that another person committed the robbery. He cites *Bruce v. United States*[63] and *Demby v. State*[64] for the proposition that "evidence that another person may have committed the crime for which the defendant is charged is admissible under the Delaware and the United States Constitutions." As a general matter, we agree with this proposition. Smith, however, misunderstands its application to the case at bar.

The State argues correctly that Smith ignores the "fundamental problem that DeShields's 2000 arrest on robbery, conspiracy, and weapons offense was irrelevant to the issue of whether Smith was

vent the prosecution from offering evidence of a defendant's prior wrongdoing for the purpose of persuading the jury that the defendant has a propensity for crime and is, therefore, likely to have committed the offense for which he stands trial. 404(b) thus protects an innocent person from being convicted "primarily because of the jury's willingness to assume his present guilt from his prior misdeed." *United States v. Aboumoussallem*, 726 F.2d 906, 911–912 (2d Cir.1984). But, "risks of prejudice are normally absent when the defendant offers similar acts evidence of a third party to prove some fact pertinent to the defense.... In such cases the only issue arising under Rule 404(b) is whether the evidence is relevant to the existence or non-existence of some fact pertinent to the defense." *Id.* Thus, "the standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as a sword." *Id.*

In an often-cited opinion discussing reverse 404(b) evidence, the Third Circuit observed that the "most persuasive treatment of 'reverse 404(b)' evidence...[holds that] a lower standard of similarity should govern 'reverse 404(b)' evidence because prejudice to the defendant is not a factor." *United States v. Stevens*, 935 F.2d 1380, 1404–05 (3d Cir. 1991) (citation omitted). The court concluded that the "admissibility of 'reverse 404(b)' evidence depends on a straightforward balancing of the evidence's probative value against considerations such as undue waste of time and confusion of the issues.... A defen-

dant may introduce 'reverse 404(b) evidence;' so long as its probative value under Rule 401 is not substantially outweighed by Rule 403 considerations." *Id., See also United States v. Banky–Alli*, 2005 WL 3116754, 2005 U.S.App. LEXIS 25427 (2d Cir.2005) (parenthetical) ("Reverse 404(b) evidence—i.e. evidence regarding other wrongs offered for defensive purposes to negate the defendant's guilt—is admissible if relevant....Risks of prejudice are normally absent when the defendant offers similar acts evidence of a third party to prove some fact pertinent to the defense. In such cases the only issue arising under Rule 404(b) is whether the evidence is relevant to the existence or non-existence of some fact pertinent to the defense."); *Sessoms v. State*, 357 Md. 274, 744 A.2d 9 (Md.2000) (collecting federal and state cases); *State v. Garfole*, 76 N.J. 445, 453, 388 A.2d 587 (N.J.1978).

We need not decide whether to adopt this broader rule in this case because we find that under either the *Getz* analysis employed in *Dollard* or the reverse 404(b) relevance analysis of the foregoing authorities, evidence of DeShields's conviction is simply not relevant.

**62.** *Dollard*, 838 A.2d at 266 (citing *Chapman v. State*, 821 A.2d 867, 869 (Del.2003)); *See also U.S. v. Farrington*, 58 Fed.Appx. 919, 924 (3d Cir.2003) (reviewing a trial judge's decision to exclude reverse 404(b) evidence for an abuse of discretion).

**63.** 820 A.2d 540 (D.C.2003).

**64.** 695 A.2d 1152 (Del.1997).

DeShields's accomplice in 2003....The fact that DeShields had been accused of an armed robbery three years earlier, when he also had an alleged accomplice... would not have tended to make it more or less probable that Smith was DeShields's accomplice in 2003." The State's argument finds some support in a recent Third Circuit Court of Appeals decision, *US v. Farrington.*[65]

■ In *Farrington,* the defendant, Farrington, and two others were charged with bank fraud. One of the co-defendants, David, plea-bargained and cooperated with the government.[66] The government tried the other co-defendant, Grosvenor, before Farrington. Grosvenor's first trial ended in a mistrial. The district court thereafter joined Grosvenor's trial with Farrington's. At the joint trial, the district court judge denied Farrington's motion to introduce evidence that Grosvenor had committed similar instances of bank fraud other than the one incident charged.[67] Farrington sought to introduce this evidence to support a defense that David and Grosvenor had operated without Farrington's help in committing the charged fraud.[68] On appeal, Farrington argued that the district court

judge erred by declining to admit the "reverse 404(b)" evidence. The Third Circuit concluded that the trial judge did not abuse his discretion when he determined that the evidence lacked relevance.[69] As the court noted, "[e]vidence that Grosvenor committed other frauds without Farrington's help does not render it less likely that he received Farrington's cooperation here."[70] The same logic applies to the case at bar: "evidence that [DeShields] committed other [robberies] without [Smith's] help does not render it less likely that he received [Smith's] cooperation here." The trial judge did not abuse his discretion by refusing to admit evidence of DeShields 2000 arrest for robbery under D.R.E. 404(b) to prove that someone other than Smith committed the robbery in this case.[71]

**B. *DeShields's 2000 arrest for robbery was admissible to show DeShields's state of mind***

■ Smith argues that "what happened to the charges in 2000 also was instructive as to ... DeShields's state of mind." According to Smith, after DeShields told the police that the 2000 incident was about drugs, the charges were nolle-

---

65. 58 Fed.Appx. 919 (3d Cir.2003).

66. *Id.* at 921.

67. *Id.*

68. *Id.* at 924.

69. *Id.* at 925.

70. *Id.*

71. Before the trial judge, Smith also argued that the evidence of the 2000 robberies should come in as evidence of DeShields's "modus operandi but almost habit-type scenario." Smith made no mention of a habit argument in his opening brief on appeal. Therefore that argument is waived. *Murphy v. State,*

632 A.2d 1150, 1152 (Del.1993) ("The failure to raise a legal issue in the text of the opening brief generally constitutes a waiver of that claim on appeal.") In any event, it appears that Smith's D.R.E. 406 habit argument, although not expressly denominated as such, is intertwined with his 404(b) argument that we discussed above. Moreover, the "habit" rule under D.R.E. 406 applies more narrowly than Smith argued below. "When evidence of habit is introduced, the desired inference from habit to the conduct in question is grounded upon a series of specific, repetitious actions." Graham C. Lilly, *An Introduction to the Law of Evidence* § 5.11 (3d ed.1996). The "four [other] separate robberies [defense counsel suggested] that [DeShields] has [allegedly] done [and] planned..." are hardly sufficient to constitute a habit to commit robbery.

prossed. In his statement to the police in the case at bar, DeShields changed his story from it simply being a drug sale to a drug rip off, "apparently in an attempt to gain some favor on the 2003 charges." Under Smith's theory, DeShields had learned from the disposition of the 2000 incident that if he "shift[ed] what this was from just robbing some person who is out there on the street or who might be around somewhere to this being a drug transaction or a drug theft, things are going to go a lot better for me." The trial judge allowed Smith no inquiry upon DeShields's "state of mind on this issue as to why he chose this story." The trial judge noted:

> This theory, as advocated by ... Smith, clearly implies at least in ... DeShields's mind, he got away with the 2000 charges because the police were not interested in prosecuting criminal charges arising out of a drug rip off or a drug transaction.

> \* \* \*

> Even if you accept ... Smith's reasoning and go along with the notion that the police do not prosecute criminal charges arising out of a drug deal gone bad, it seems implausible that DeShields in 2003 could have thought he could make the matter simply go away by calling it a drug rip off when he had ... Coverdale's body laying in the yard to deal with. Obviously, this wasn't going away quickly or easily.

> \* \* \*

The argument is that DeShields got out of the 2000 charges by calling the matter just a drug rip off involving a drug dealer and that he hoped to get out of the 2003 charges by calling them just a drug rip off, and lying about other as-

pects of the 2003 incident simply do not make any sense to me. . . .

Under this theory, the evidence was only marginally relevant, if at all. No one was killed in the 2000 incident. Even if we accept the defendant's version of the 2000 events as true—that the State dropped the robbery charges after DeShields indicated that the "incident was about drugs"—it is highly unlikely that DeShields believed that murder charges would "go away" if the murder stemmed from a drug "rip off" gone wrong.[72] Moreover, by the time DeShields testified as a witness in Smith's trial he had been convicted of Coverdale's murder and sentenced to life imprisonment.[73] DeShields's alleged motive to change his story only applied, if at all, when he made his statement to the police, which implicated Smith to such a degree that the State introduced it at trial as evidence against Smith. We cannot conclude that the trial judge abused his discretion by refusing to admit the evidence on the theory that it was relevant to DeShields's state of mind.

### C. DeShields's 2000 arrest for robbery was admissible as a specific incident of untruthfulness under D.R.E. 608(b)

█ Smith argues that he should have been able to confront DeShields about the prior robbery because it was a specific instance of untruthfulness under D.R.E. 608(b). D.R.E. 608(b) provides that:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may not be proved by extrinsic evidence. They may, however, *in the discretion of the court*, if probative of truthfulness or untruthfulness, be inquired into on

---

**72.** The State's explanation seems more plausible: the charges were nolle-prossed when the victim refused to cooperate.

**73.** See *DeShields v. State,* 879 A.2d 591, 592 (Del.2005).

cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness....

The trial judge considered this argument and concluded:

> To me, the mere fact that Shane DeShields was merely charged with various crimes in 2000 is not, in my view, prohibitive [sic—"probative"] of his truthfulness or untruthfulness in 2003 when he gave the statement to the police or in 2005 when or if he testifies in this case.

As D.R.E. 608(b) itself indicates, introduction of specific incidents of misconduct to attack a witness's character for truthfulness on cross examination is a matter of judicial discretion.[74] On the facts of this case, we are satisfied that the trial judge did not abuse his discretion by refusing to allow the defense to inquire into the 2000 incident of robbery on cross-examination under 608(b). Moreover, during cross-examination of DeShields, defense counsel was essentially able to make the same point by making reference to actual convictions under D.R.E. 609.[75] Under this theory of admissibility, Smith suffered no conceivable prejudice from the trial judge's discretionary decision.

**74.** *See Crawley v. State,* 1991 WL 165569, 1991 Del. LEXIS 279 (Del.1991) (order).

**75.** An excerpt of the exchange follows:
Q: You were convicted of a felony back in 2000, correct?
A: What felony is that?
Q: Drug dealing.
A: Yes.
Q: And you got three years in prison? You had to do a prison program, correct?
A: Yeah. I did six months in Boot Camp.
Q: And, in fact, when this happened you were on release on probationary status from that conviction still, right?
A: Yes.
Q: And you violated your probation?
A: Yes.
Q: And if you recall it, you were facing three years if you were caught?

## D. Smith should have been able to cross-examine DeShields about the statement that DeShields never owned a gun

During its case in chief, the State introduced a taped statement DeShields had given to the police in which he stated: "No, no, no, I gave it [the gun he used in the April 17, 2003 robbery] back to him [Smith]; I ain't never owned a gun before. In fact, I had a couple charges before, you understand what I saying, but I ain't never owned a gun." Smith argued to the trial judge that "we know [DeShields] had the gun before because he took it out of a glove compartment to rob" the victim of the 2000 incident. According to Smith, this was another piece of impeachment evidence. It was important, Smith argued, because DeShields's testimony was that Smith was the supplier of the guns and DeShields never owned a gun before. "Yet in 2000 [DeShields] is robbing people with guns...When he makes statements like that and that he never owned a gun before, that is directly contradictory evidence" about which the defense should have been able to cross-examine DeShields.

A: Yes

* * * * * *

Q: And after that 2000 conviction and then before now, obviously, you also have been convicted of some other felonies, too, correct?
A: Yes.
Q: You also obviously had done other robberies of drugs which you mentioned in your statement, correct?
A: Yes.
Q: It's normal?
A: Yes.
Q: One in which you took what, $5,850?
A: Yes.
Q: And the same guy that you robbed that Mr. Coverdale had robbed?
A: Yes.

The prosecutor responded that DeShields was distinguishing between owning and possessing. "DeShields didn't say he never possessed a gun. He was clearly admitting he possessed a gun. He said he never owned a gun before. So I just don't think it's admissible." The trial judge agreed, concluding:

> I think there is a difference between possessing a gun and owning a gun. He said he never owned a gun. The alleged victim [in the 2000 robbery], in all likelihood, will not be able to come in here and say who actually owned the gun anyway. So I don't think you will be able to contradict him on that point. I concluded a long time ago the alleged charges in 2000 have little, if anything, to do with whether or not . . . DeShields was being truthful. So I don't want to have another trial on what he was charged with in 2000 in an attempt to show he's not being truthful when he testifies. . . .

 "When impeachment evidence is offered to show . . . contradiction . . . the admissibility of that evidence is controlled by D.R.E. 402 and 403." [76] Under D.R.E 402, all relevant evidence is admissible subject to the other rules of evidence or statutory limitations. D.R.E. 403 is one such limitation. D.R.E. 403 provides that the trial judge may exclude relevant evidence if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." We review a trial judge's discretionary rulings under D.R.E. 403 for an abuse of discretion. [77]

The trial judge offered two reasons for his decision to prohibit Smith from introducing evidence on this issue: (1) the evidence that Smith wanted to introduce simply did not contradict DeShields's statement; (2) the trial judge did not want to conduct a trial within a trial. The trial judge's decision is supported by an orderly and logically deductive process, is not clearly erroneous, and is well within his discretion to admit or exclude evidence.

### Confrontation Clause Issues

 Smith does not expressly argue that any of the trial judge's four rulings excluding the defense from cross-examining DeShields on the 2000 robbery violated his right to cross-examine DeShields under the Confrontation Clause of the Sixth Amendment to the United State Constitution [78] or Article I, section 7 of the Delaware Constitution. [79] Because "a certain threshold level of cross examination is constitutionally required, and the discretion of the trial judge may not be interposed to

**76.** *Baumann v. State,* 891 A.2d 146 (Del. 2005).

**77.** *Charbonneau v. State,* 904 A.2d 295, 308 (Del.2006)

**78.** U.S. CONST. *amend.* VI:

In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . .

**79.** DEL. CONST. art. I, § 7:

In all criminal prosecutions, the accused hath a right to . . . meet the witnesses in their examination face to face. . . .

In this case, Smith did not explicitly cite either the Delaware or Federal constitutions. He thus did not argue that the *Delaware Confrontation Clause* provides more protection than the *Federal Confrontation Clause.* We will, therefore, analyze this issue under the United States Constitution only. *See Reid v. State,* 2005 WL 3272134, *2, 2005 Del. LEXIS 492, *8 (Del.2005) (order) (citing *Feleke v. State,* 620 A.2d 222, 228 (Del.1993)). *See also Ortiz v. State,* 869 A.2d 285, 291 (Del.2005) ("[T]hat alleged violation of the Delaware Constitution will not be addressed because it was not fully and fairly presented to this Court as an issue on appeal.")

defeat it," [80] we must consider whether the trial judge's evidentiary rulings restricting Smith's ability to cross-examine DeShields about the incident underlying his arrest for robbery in 2000 unconstitutionally infringed on Smith's right to confront and cross-examine DeShields. We review an alleged constitutional violation relating to a trial court's evidentiary ruling *de novo*.[81]

"[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." [82] "Although a trial judge has 'wide latitude' in controlling cross-examination, that discretion is not absolute." [83] Moreover:

> When the cross-examination relates to impeachment evidence, the test for determining if the trial judge's limitation on cross-examination violated the defendant's confrontation right is whether the jury had in its possession sufficient information to appraise the biases and motivations of the witness.... More specifically, we look to the cross-examination permitted to ascertain (1) if the jury was exposed to facts sufficient for it to draw inferences as to the reliability of the witness and (2) if defense counsel had an adequate record from which to argue why the witness might have been biased.... [84]

From the record, it appears that defense counsel effectively and ably cross-examined DeShields. DeShields admitted

to making untruthful statements to the police, on direct examination, and in a letter to a friend describing Coverdale's murder. DeShields also admitted that he had previously been convicted of felonies for drug dealing and that he had committed other "robberies of drugs." Through his questions, defense counsel was able to insinuate that DeShields was able to conform his testimony in Smith's trial to the physical evidence (i.e., the bullet in the door) because DeShields had previously heard forensic expert testimony about this evidence during his own trial. Moreover, defense Counsel had the opportunity to explore the deal DeShields made with the State. We are satisfied that the jury was exposed to facts sufficient for it to draw inferences about DeShields's reliability and credibility and that defense counsel had an adequate record from which to argue why the witness might have been biased. Thus, the jury had in its possession sufficient information to evaluate DeShields's biases and motivations. Accordingly, Smith's appeal on this issue must fail.

### 7. Trial judge's alleged errors in prohibiting Smith from cross-examining Blackwell about Blackwell's recent arrest for dealing drugs and juvenile arrest for robberies of senior citizens

Again, Smith does not explicitly argue that the trial judge's rulings limiting his ability to cross-examine Blackwell about Blackwell's possible bias in favor of the State violated his rights under the Sixth Amendment of the United States Constitution or Article I, section 7 of the Delaware Constitution. Smith does, however, cite *Weber v. State* [85] for the general proposi-

---

**80.** *Weber v. State*, 457 A.2d 674, 682 (Del. 1983).

**81.** *Flonnory v. State*, 893 A.2d 507, 515 (Del. 2006) (citing *Johnson v. State*, 878 A.2d 422 (Del.2005))

**82.** *Snowden v. State*, 672 A.2d 1017, 1025 (Del.1996) (citing *Delaware v. Van Arsdall*,

475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

**83.** *Id.*

**84.** *Id.* (quoting *Weber*, 457 A.2d at 682).

**85.** 457 A.2d 674 (Del.1983).

tion, as he puts it, that "a defendant has a right to cross-examine the prosecution['s] witness to explain the witnesses['] bias and motivation." *Weber* involved a defendant's argument that he was denied his constitutional right to impeach the credibility of three witnesses by examining their bias. We will therefore assume that Smith is raising a constitutional argument, namely that the trial judge's limitation on his ability to cross-examine Blackwell violated his constitutional rights to confront his accuser.[86] We review alleged constitutional violations relating to a trial court's evidentiary ruling *de novo*.[87]

As in the case of DeShields, we must consider whether the trial judge's evidentiary rulings restricting Smith's ability to cross-examine Blackwell about the incident underlying his arrest for robbery in 2000 unconstitutionally infringed on Smith's right to confront and cross-examine Blackwell. "More specifically, we look to the cross-examination permitted to ascertain (1) if the jury was exposed to facts sufficient for it to draw inferences as to the reliability of the witness and (2) if defense counsel had an adequate record from which to argue why the witness might have been biased."[88] Smith claims that the trial judge erred by failing to allow him to question Blackwell about two incidents. We discuss each incident in turn.

### A. *Blackwell's recent arrest for dealing drugs*

Shortly before Smith's trial, Blackwell was arrested for the delivery of cocaine. Defense counsel requested that the trial judge order the State to produce its entire file on Blackwell's arrest, including any statements Blackwell gave to the police, the probable cause sheet, police reports, notes of any police officer's interview with Blackwell, and any tapes of the incident. The State responded that it would certainly be acceptable for defense counsel to inquire into the arrest during cross-examination of Blackwell and to ask if the State made a deal with Blackwell in exchange for his testimony, but that defense counsel should not be able to inquire into the specific details of the incident underlying Blackwell's arrest. The State informed the trial judge that it had gone through its file but did not find any *Brady* material. One of the prosecutors called the arresting officer to inquire whether Blackwell made a statement at the time he was arrested. The State informed the trial judge that the arresting officer said that Blackwell made no statement at the time of his arrest. The State also offered to produce its file for the trial judge to review to determine whether the State missed any *Brady* material. The trial judge agreed to independently review the State's file on Blackwell's recent arrest. After reviewing the affidavit of probable cause and the police report on Blackwell's drug charge, the trial judge concluded that there was no *Brady* material in the documents that in any way related or touched on the 2003 charges against Smith. At a later point in the trial, the trial judge reviewed a videotape of the actual event for which Blackwell had been charged and determined that there was no *Brady* material in the videotape.

 During defense counsel's cross-examination of Blackwell the following exchange occurred:

---

**86.** Because Smith did not specifically raise the protections of the Delaware Constitution on appeal, that claim is waived and we will analyze this issue only under the United States Constitution. *See Ortiz v. State,* 869 A.2d at 291, n. 4.

**87.** *Flonnory,* 893 A.2d at 515.

**88.** *Snowden,* 672 A.2d at 1025 (quoting *Weber,* 457 A.2d at 682).

Q: And that wasn't the last time you have been arrested, was it?

A: No, sir.

Q: January 6th was the last arrest?

A: Yes, sir.

Q: Of this year?

A: Yes, sir.

Q: And that was for delivery of drugs, right?

A: Yes, sir.

Q: And that charge is still pending against you, isn't it?

A: Yes.

Q: You are facing five years in jail?

A: I don't know what I'm facing, sir.

Q: Didn't the magistrate read to you what the charge was?

A: No, sir.

Q: Is it a felony charge?

A: I don't know, sir.

Q: You don't know nothing about that?

A: Nothing about it.

Q: Do you realize that that charge can put you in jail a significant amount of time?

A: Yes, sir.

Q: Do you expect the State to help you out?

A: I don't expect anybody to help me out.

Q: You don't think if you help them out in this case, it will make things easier for you in your case?

A: I seriously doubt it. They haven't said anything about helping me out, no. [continued below in Subsection 7.B of this opinion]

Smith claims that he was denied the opportunity to cross-examine Blackwell about an alleged deal he made with the State for this disposition of this charge. The trial judge made the affidavit of probable cause and the police report part of the record as a sealed court exhibit. We have reviewed the court exhibit the trial judge provided containing the documents related to Blackwell's then-pending charge and reach the same conclusion as the trial judge. There is nothing in either document that relates to a deal Blackwell made with the State as it relates to his arrest and charge for delivery of cocaine.[89] Because there was no deal, even if Smith had access to the State's file on Blackwell's arrest, his counsel would have been able to do nothing more than what he did when he cross-examined Blackwell on the issue of bias. Moreover, the questions defense counsel was able to ask provided him with a sufficient foundation to argue that Blackwell was potentially biased, even though Blackwell had apparently not entered into an agreement with the State relating to his pending drug charges.

B. *Blackwell's juvenile robbery pleas*

Defense counsel continued Blackwell's cross examination by asking Blackwell:

[*continued from above*]

Q: You have done this in the past, you've helped the State, haven't you?

A: Like could you explain your question?

Q: Well, you were charged with three separate robberies of senior citizens correct?

A: I was charged with it?

Q: Yes or no?

---

**89.** Moreover, at another point, in response to the trial judge's direct question—"you offered him [Blackwell] nothing on this pending charge...?"—the prosecutor answered, "Nothing, never spoke a word to him since the DeShields' trial when I had him in court." The prosecutor's statement confirms our review of Blackwell's file. Absent any evidence to the contrary, we presume that the prosecutor adhered to his duties of an officer of the court by honestly answering the trial judge's question. *See* DELAWARE LAWYERS' RULES OF PROF'L CONDUCT, Rule 3.3(a).

A: Yes.

Q: You have some doubt? You need to read your record?

A: I've never robbed anybody.

Q: You were charged with three robberies of senior citizens, right?

At this point, the State objected. At a sidebar, defense counsel argued that the inquiry was relevant to explore Blackwell's bias. According to defense counsel, when he was charged with three separate robberies of senior citizens in the past, Blackwell "cut a deal" with the State "to help the State out." The deals Blackwell allegedly entered into with the State to "get out of" the robbery charges "impacted his expectation" of getting something from the State by testifying in Smith's case like he allegedly had "gotten something" in the past in exchange for his testimony. In other words, defense counsel argued that Blackwell's habit of making deals with the State to "get out of" criminal charges was relevant to show his bias in the case at bar. The three robberies at issue were juvenile adjudications.

The trial judge gave the parties the opportunity to question Blackwell out of the presence of the jury. Blackwell explained that he entered into a plea agreement with the State to resolve the three robbery charges against him. He said that he did so without a lawyer because "there was no evidence. They gave me a plea to stealing one car. I took it because I didn't do anything to any old woman." Defense counsel then asked:

Q: You agreed to testify truthful[sic] in this case, right?

A: Yes, sir.

Q: And by testifying truthfully, that would help the State convict the other people who actually did this, right?

A: If that's what you want to call it. The people that did it were charged and found guilty.

Q: They had a trial and you testified?

A: I didn't testify against anybody. They dropped the charges against me. They gave me the charge, the one car and found the other people—I can name their names if you want. They got charged with it and are in jail right now for it.

Q: You didn't have to go in the courtroom and testify about it, right?

A: No, sir.

Q: But you had agreed with the State that you would help the State and testify against those people who actually did it?

A: No, sir. I had no connection with the people that did it.

Q: Didn't you us you agreed to testify truthful[ly] and you testified?

A: I didn't do anything. They gave me this plea to stealing one car. I took the plea. The people that did it, they got them.

In response to the prosecutor's *voir dire* questions, Blackwell admitted a juvenile offense of theft misdemeanor, but said that he did not testify against anyone in connection with that case nor did he make any agreement with the State in connection with the case other than that he would admit a theft misdemeanor.

After hearing arguments from counsel, the trial judge decided to allow defense counsel to ask whether Blackwell had a juvenile adjudication for a theft misdemeanor in the presence of the jury. The trial judge also instructed the jury to disregard the mention of Blackwell's arrest for robbing senior citizens. At defense counsel's request the trial judge agreed to review *in camera* the State's file on Blackwell's juvenile adjudication to determine "what kind of deal, if any, was struck in that case." The trial judge agreed. After reviewing Blackwell's Family Court Plea Agreement, the trial judge concluded that

Blackwell entered into no deal with the State in relation to the incident at issue. The trial judge also gave defense counsel an opportunity to review the plea agreement. Defense counsel did so and stated,

Well, now that I am looking at this, I can come up with another false statement that ... Blackwell stated. He told us he was not represented by counsel. He was represented by counsel...He told us a story about he was not guilty and he went in there without counsel. Of course, this was something which was in possession of the State. It is impeachable material.... Also...Blackwell told us he pled guilty to one theft. There are two thefts on here.

Defense counsel then asked the trial judge to instruct the jury upon those additional false statements Blackwell made. The trial judge declined to do so, concluding: "I am not going to do anything else with that. The argument was that he got something from the State in exchange for some obligation to do something for the State. That has not been borne out by my review of that Plea Agreement."

 Smith argues on appeal that the trial judge erred by not allowing any cross-examination on the issue of Blackwell's juvenile robberies to show "how the defendant made a habit of making deals with the State of Delaware, as he did in the case at bar. This was error and hurt defendant's efforts to show ... Blackwell's bias and prejudice in that he had entered into a deal with the State of Delaware." The record does not support Smith's contention. We have examined the Family Court Plea Agreement and reach the same conclusion as the trial judge: the plea agreement says nothing about whether Smith entered into a deal with the State to do anything other than plead to the thefts. He did not agree to testify in any hearing whatsoever in exchange for the plea deal. Defense counsel, who had the opportunity to review the agreement, apparently agreed. Moreover, the trial judge did not err or abuse his discretion by refusing to instruct the jury that Blackwell lied (or did not recall) that he had a lawyer when he entered the plea to the juvenile offense or that he entered pleas to two thefts rather than one. These were extremely minor points contradicting statements that occurred on *voir dire* examination outside of the presence of the jury. This is particularly true in light of the fact that Blackwell admitted to making several other untrue statements during cross-examination.

As was the case with DeShields, defense counsel effectively and vigorously cross-examined Blackwell. Blackwell admitted to intentionally making untrue statements to a police officer, to being convicted of several crimes of dishonesty, and to having a pending drug charge. Furthermore, defense counsel very meticulously used Blackwell's prior statements to undermine his credibility by pointing out inconsistencies. Finally, even though Blackwell admitted to having no deal with the State on the pending charges, defense counsel's inquiries made the jury aware of the pending charges. From the record, we are satisfied that the jury was exposed to facts sufficient for it to draw inferences about Blackwell's reliability and credibility and that defense counsel had an adequate record from which to argue why Blackwell might have been biased. Accordingly, Smith's appeal on this issue must fail.

8. *The trial judge's alleged error in admitting evidence about Smith's financial status*

During direct examination the following exchange took place between defense counsel and Smith:

Q: In 2003, where were you living?
A: I was staying in Maryland.
Q: You were staying in Maryland?
A: Yes.

Q: Where were you working at?

A: My uncle had a detail business and I would help him out.

Q: You would help him out?

A: Yes.

Q: Were you doing any other things?

A: No.

On cross-examination the prosecutor wanted to further question Smith about his employment. Particularly, the prosecutor wanted to clarify for the jury how much Smith actually worked, and how much Smith was compensated.[90] Defense coun-

sel, cited *United States v. Mitchell*,[91] and objected to the prosecutor's line of questions because he believed Smith's financial status was irrelevant. The trial judge overruled defense counsel's objection.

The prosecutor then asked Smith specific questions about his job and living arrangements.[92] Smith explained that his job was part-time, and that he worked "at least" two days per week. Smith testified that he detailed cars two days a week and would earn between two hundred and two hundred and fifty dollars.[93] Smith also reiterated that his part-time job was his

---

**90.** The prosecutor argued to the trial judge that Smith's compensation was relevant because it showed Smith's motive to commit the crime. The prosecutor argued that DeShields testified that he told Smith before the robbery that he knew "a quick way to get some cash." Therefore, in the prosecutor's mind, if he could demonstrate that Smith needed money, then he could show that Smith had a motive to join DeShields's quest to get some "quick cash." It is worth noting that *the prosecutor never made this argument to the jury*. Because we decide this issue on other grounds, we do not reach the issue of whether Smith's financial status was admissible to show his motive to commit robbery. We can affirm on the basis of a different rationale than that relied upon by the trial court. *See Sloman,* 886 A.2d at 1265

**91.** 172 F.3d 1104 (9th Cir.1999).

**92.** The following exchange between the prosecutor and Smith took place:

Q: How often were you doing this part-time work [car detailing] for your uncle?

A: Whenever he calls me?

Q: I'm sorry?

A: Whenever he calls me.

Q: How often would he call you back in, say April, the first couple weeks in April, late March, around a month before this, how often was he calling you?

A: Well, he calls me like no less that two times a week.

Q: So two times a week you would go and help him, correct?

A: Yes.

Q: Now, would you just do a whole car for him or you both work on a car?

A: It's like different cars. You go—one person goes here, one person goes there and I go to wherever assigned.

Q: Would your uncle go with you?

A: No, but he would sometimes show up while I'm there.

Q: It's his business, not your business, correct?

A: No, it's not my business.

Q: It was his business?

A: Yes.

Q: So what was your deal, how much did you get for detailing a car? What would he get and what would you get?

A: I don't know how much he gets, but he pays me around 200–some, 250, something like that.

Q: Is that your only source of income?

A: Yes.

Q: And where were you living at the time? In Maryland, you say?

A: Yes. . . .

Q: Were you living with someone?

A: Yes.

Q: Was this his place, both of your place?

A: His place.

Q: Did you have to pay rent there?

A: No.

Q: He just let you stay there for nothing?

A: Yes.

**93.** It is difficult to determine how much Smith actually earned because it is unclear if he received two hundred dollars per week or two hundred dollars for each car he detailed. There is a significant difference if he was paid on a per car basis. For example, if he earned two hundred per car, he could have earned eight hundred dollars per week if he detailed two cars every day that he worked. Put sim-

only source of income.[94] Moreover, Smith clarified that he lived rent-free at a friend's house.

Smith now argues on appeal that the trial judge erred by allowing the State to question him about his working and living arrangements because it was irrelevant to show Smith's motive to commit robbery. Smith relies on *Mitchell* where the Ninth Circuit Court of Appeals stated:

> Poverty as proof of motive has in many cases little tendency to make theft more probable. Lack of money gives a person an interest in having more. But so does desire for money, without poverty. A rich man's greed is as much a motive to steal as a poor man's poverty. Proof of either, without more, is likely to amount to a great deal of unfair prejudice with little probative value.[95]

Put simply, Smith argues that proof of poverty, by itself, cannot establish motive to commit robbery. The State responds that, even if *Mitchell* applied, Smith's working and living arrangements became relevant when defense counsel "opened the door" on direct examination.

Delaware recognizes the evidentiary principle of "opening the door."[96] The "opening the door" theory is premised upon considerations of fairness and the truth-seeking function of a trial. In *Tucker*, we stated:

Generally, when a party opens up a subject, he cannot object if the opposing party introduces evidence on the same subject. This is true even though the evidence developed on cross-examination would have been inadmissible if the cross-examiner had offered it directly into evidence. The rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage. Yet, the doctrine of opening the door is limited to testimony that might explain or contradict the testimony offered by the opposing party on direct examination; it cannot be "subverted into a rule for injection of prejudice."[97]

Put simply, "opening the door" is a way of saying one party has injected an issue into the case, and the other party should be able to introduce evidence to explain its view of that issue.

■ Here, defense counsel "opened the door" to the prosecution's exploration of the Smith's working arrangements. Defense counsel asked a question about Smith's employment on direct examination. While Smith's employment may have had no relevance to Smith's case, the prosecutor may have fairly inferred that defense counsel introduced Smith's employment to

---

ply, one cannot clearly determine how much Smith actually made based on the evidence presented at trial.

**94.** Smith had already testified on direct examination that car detailing was his only source of income. *See supra* pp. 1237–38.

**95.** 172 F.3d at 1108–09.

**96.** *Tucker v. State,* 515 A.2d 398 (Del.1986) (citing *United States v. Lum,* 466 F.Supp. 328, 334 (D.Del.1979)); *Miller v. State,* 750 A.2d 530 (Del.2000)(recognizing that "the defense summation may open the door to an otherwise inadmissible prosecution rebuttal.")

(quoting *United States v. Tocco,* 135 F.3d 116 (2d. Cir.1998)); *Young v. State,* 431 A.2d 1252, 1255 (Del.1980); *Casalvera v. State,* 410 A.2d 1369, 1373 (Del.1980)(recognizing that although prior wrongful acts are generally not admissible to show that a criminal defendant has committed the crime, the defendant opens the door to the admission of prior wrongful acts when he presents affirmative evidence of prior good conduct to show his good character.); *James v. Glazer,* 570 A.2d 1150, 1155 (applying the "open the door" theory in a civil case).

**97.** *Tucker,* 515 A.2d at 398 (citing *Lum,* 466 F.Supp. at 334).

suggest to the jury that Smith did not have a motive to commit robbery because he was employed. Moreover, the prosecutor may have fairly assumed that defense counsel did not attempt to fully explain all the specifics of Smith's employment because the specifics were not favorable to Smith. Certainly, the prosecutor was not required to sit silently and accept the fact that defense counsel was selectively tailoring evidence that he believed might benefit Smith. Because defense counsel "opened the door," the prosecutor was permitted to introduce otherwise irrelevant evidence that negated the arguable inference that Smith's counsel wanted the jury to draw from his limited inquiry into Smith's employment.[98] The prosecutor did just that: he asked Smith how much he actually worked, and asked Smith how much compensation he received. At no point did the prosecutor attempt to argue a prejudicial inference from these facts. In other words, the prosecutor only attempted to amplify specifics of Smith's employment. The prosecutor *never argued to the jury* that Smith had a motive to commit robbery because he lacked financial resources.

 Moreover, putting aside the fact that defense counsel "opened the door," and accepting Smith's contention that the trial judge erred by admitting evidence of his working and living arrangements, the error was harmless. Smith suggests that the prosecutor's questions—and Smith's answers—implied that he was poor. The record indicates otherwise. The minimum one can infer from the record is that Smith detailed cars "at least" two days per week and was paid about two hundred dollars for each car he detailed.[99] No inquiry was made about how many cars Smith detailed per day. Therefore, the prosecutor's questions may have negated the inference that Smith's counsel wished the jury to draw but they gave no indication that Smith's financial resources indicated such a level of poverty that he was compelled to commit robbery in order to subsist because, on this record, no one can determine his actual income.[100] Assuming that the admission of the evidence was error, we cannot find that this scant reference to Smith's compensation and living arrangements undermined the fairness of Smith's trial.[101]

98. Likewise, the prosecution was permitted to further explain Smith's living arrangements because defense counsel "opened the door" when defense counsel asked the irrelevant question about where Smith lived. The prosecutor simply asked questions to further explain Smith's living arrangements and remove a possible inference that Smith owned a house in Maryland.

99. *See supra* n. 92.

100. In fact the jury could have assumed that Smith had a fair amount of resources. We offer the following illustration. Assuming that Smith only worked two days a week, and detailed a modest two cars per day for two hundred dollars per car, his yearly salary would be $41,600(4 cars/week (x) $200/car (x) 52 weeks). Certainly if Smith made $41,600 while he was living rent-free at a friend's house, one would not fairly conclude that

subsistence level poverty drove Smith to criminal activity.

101. Smith also argues that the trial judge erred in a related incident when the trial judge refused to allow Smith's direct testimony that his two attorneys were court-appointed. Smith wanted to introduce this testimony to explain DeShields's motive for allegedly fabricating his testimony in order to "bring Smith down with him." Smith testified that at the preliminary hearing DeShields was represented by a public defender, but that he was represented by private counsel. DeShields was allegedly angry with Smith for not helping him pay for his own private counsel, and thus had a motive to fabricate his testimony at Smith's trial. In response to defense counsel's question, Smith answered that his two trial attorneys were court-appointed. The State objected. The trial judge concluded that the defense could ask "Could you afford an attorney for ...DeShields?" The trial

### 9. The trial judge's alleged error by instructing the jury on the defendant's criminal culpability as a principal [102]

At the prayer conference, the State argued that because Smith was indicted as a principal, it was appropriate for the trial judge to give a general instruction consistent with the indictment, and then to provide supplementary instructions on accomplice liability. Defense counsel disagreed and argued that the trial judge should only give an accomplice instruction because the parties stipulated at trial that DeShields caused Coverdale's death. In other words, defense counsel claimed that because DeShields caused Coverdale's death, Smith could only be found liable as an accomplice, and therefore, no principal instruction should be given. The trial judge agreed with the prosecution and first gave a general principal instruction about Smith's charges. After the general instruction the trial judge told the jury. that "[t]he State and Smith have stipulated that DeShields actually shot and killed Coverdale." The trial judge then immediately proceeded to instruct the jury on accom-

plice liability. Smith now claims on appeal that the trial judge erred by providing a general principal instruction and that the instruction undermined the jury's duty to intelligently perform its function.

 The test for determining the appropriateness of jury instructions is well settled. "As a general rule, a defendant is not entitled to a particular instruction, but he does have the unqualified right to a correct statement of the substance of the law." [103] "A trial court's jury charge will not serve as grounds for reversible error if it is 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.' " [104] In evaluating the propriety of a jury charge, we view the jury charge as a whole with no individual statement read in a vacuum.[105] "The standard is not one of perfection; 'some inaccuracies and inaptness in statement are to be expected in any charge.' " [106] Even where there are some inaccuracies in a charge, we will reverse only if the alleged deficiency in the jury instructions undermined the jury's

judge then instructed the jury to disregard Smith's answer that his two trial attorneys were court-appointed. Smith's attorneys did not follow up with the question the trial judge allowed. If they had done so, the answer would have even further "opened the door" to the State's questioning on cross-examination. On the facts of this case, we are satisfied that the trial judge did not err in resolving this issue.

**102.** Smith also argues that the trial judge erred by instructing the jury on the charge of Second Degree Murder because there was no evidence presented by the State that he acted "under circumstances which manifest a cruel, wicked, and depraved indifference to human life." This argument lacks merit. We have held that a "cruel, wicked and depraved indifference to human life" could be found where the "intentional acts [of the defendant] were so fraught with danger . . .—so likely to cause death or great bodily harm . . . ." *Waters v. State,* 443 A.2d 500, 505 (Del.1982) (quoting

*Brinkley v. State,* 233 A.2d 56, 58 (Del.1967)). Certainly a reasonable jury could have found that Smith's firing of his weapon at Coverdale was fraught with danger and likely to cause death or great bodily harm.

**103.** *Bullock v. State,* 775 A.2d 1043, 1047 (Del.2001); *Floray v. State,* 720 A.2d 1132, 1138 (Del.1998)(quoting *Flamer v. State,* 490 A.2d 104, 128 (Del.1983)).

**104.** *Id.* (citing *Baker v. Reid,* 57 A.2d 103, 109 (Del.1947)). *See also Haas v. United Technologies Corp.,* 450 A.2d 1173, 1179–80 (Del. 1982), appeal dismissed, 459 U.S. 1192, 103 S.Ct. 1170, 75 L.Ed.2d 423 (1983); *Storey v. Castner,* 314 A.2d 187, 194 (Del.1973); *Flamer,* 490 A.2d at 128.

**105.** *Id.* (citing *Flamer v. State,* 490 A.2d at 109).

**106.** *Sirmans v. Penn,* 588 A.2d 1103, 1104 (Del.1991) (quoting *Baker,* 57 A.2d at 109).

ability to "intelligently perform its duty in returning a verdict." [107]

██ Here, the trial judge first gave a general principal instruction because Smith was indicted as a principal. After the general instruction he explained that a person *charged as a principal* can be convicted as an accomplice. The trial judge gave the general instruction to dispel any ambiguity caused by the fact that Smith was indicted as a principal but was actually being tried as an accomplice because of the stipulation. Moreover, the trial judge twice repeated the stipulation that DeShields killed Coverdale removing the possibility that the jury would misinterpret the general principal instruction and convict Smith as a principal. Reading these instructions as a whole, we certainly cannot find that the instruction undermined the jury's ability to intelligently perform its function.[108]

### CONCLUSION

For the foregoing reasons, the judgments of the Superior Court and Smith's convictions are affirmed.

### APPENDIX

### IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR SUSSEX COUNTY

### STATE OF DELAWARE

v.

### MICHAEL R. SMITH

CRIMINAL ACTION NO.

03–05–0134 Murder in the First Degree

03–05–0137 Possession of a Firearm During the Commission of a Felony

03–05–0579 Murder in the First Degree

03–05–0580 Possession of a Firearm During the Commission of a Felony

03–05–0135 Robbery in the First Degree

03–05–0138 Possession of a Firearm During the Commission of a Felony

03–05–0136 Robbery in the First Degree

03–05–0139 Possession of a Firearm During the Commission of a Felony

03–05–0141 Conspiracy in the Second Degree

### CHARGE TO THE JURY

**Trial Date: January 19–20, 24–27, 31, February 1–2, 2005**

James W. Adkins, Esquire and David Hume, Esquire, Department of Justice, Georgetown, Delaware, attorneys for the State.

Edward C. Gill, Esquire and Michael Abram, Esquire, attorneys for the defendant.

### DUTY OR FUNCTION OF JUDGE AND JURY

Members of the jury, you have now heard all of the evidence that is going to be presented in this case, and in a few minutes you will hear the arguments of the attorney for the State and for the defendant. I shall not review the evidence that has been presented to you because you, the jury, are the sole and exclusive judges of the facts of the case, of the credibility of the witnesses, and of the weight and value of their testimony.

I shall now instruct you as to the applicable principles of law governing this case.

---

**107.** *Floray*, 720 A.2d at 1138 (citing *Probst v. State*, 547 A.2d 114, 119 (Del.1988)).

**108.** Because so many of the arguments made to us in this case cannot be resolved or even fairly understood without reading the instructions "as a whole," we have taken the unusual step of attaching the entire jury instruction as an appendix to this Opinion.

No single one of these instructions states all of the law applicable to this case. Therefore, you should listen and consider all of these instructions together in reaching your verdict. It is your duty as jurors to follow the law as I shall state it to you. You are not to be concerned with the wisdom of any rule or law stated by me. You must apply the law as instructed even if you do not agree with that law because it is the law of this State as enacted by the Legislature.

It is your duty to determine the facts and to determine them only from the evidence presented to you. You are to apply the law, as I will instruct you, to the facts and, in this way decide the case.

If, in these instructions, any rule, direction or idea is stated in a manner which appears to give it more significance than other instructions, no such emphasis is intended by me, and none should be inferred by you.

The defendant is charged by indictment with two counts of murder in the first degree, four counts of possession of a firearm during the commission of a felony, two counts of robbery in the first degree and one count of conspiracy in the second degree. The defendant pled "not guilty" to these charges.

The indictment is a mere accusation against the defendant. It is the charging document. It is not, in itself, any evidence of the guilt of the defendant, and you should not allow yourselves to be influenced in any way, however slightly, by the fact that an indictment has been filed against the defendant.

In these instructions, I will explain the elements of the offense(s) charged in the indictment. The elements of an offense are those physical acts, attendant circumstances, results and states of mind which are specifically included within the definition of the offense in the Criminal Code. If words are defined in the Criminal Code, I will give you their Code definitions. Otherwise, you should give words their commonly accepted meanings. I will also explain the burdens of proof the law imposes upon the State as well as other aspects of your function as jurors. Finally, I will explain the possible verdicts.

### INDICTMENT BY THE GRAND JURY

The Grand Jury charges that **MICHAEL R. SMITH** did commit the following offenses, to wit:

### COUNT 1—MURDER IN THE FIRST DEGREE—S03–05–0134

**MICHAEL R. SMITH**, on or about the 17th day of April, 2003, in the County of Sussex, State of Delaware, did intentionally cause the death of George K. Coverdale, in violation of Title 11, § 636(a)(1) of the Delaware Code.

### COUNT 2—POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY—S03–05–0137

**MICHAEL R. SMITH**, on or about the 17th day of April, 2003, in the County of Sussex, State of Delaware, did knowingly possess a firearm, a handgun, during the commission of Murder in the First Degree, a felony, as set forth in Count # 1 of this Indictment, which is herein incorporated by reference, in violation of Title 11, § 1447A(a) of the Delaware Code.

### COUNT 3—MURDER IN THE FIRST DEGREE—S03–05–0579

**MICHAEL R. SMITH** on or about the 17th day of April, 2003, in the County of Sussex, State of Delaware, did in the course of and in furtherance of the commission of a felony, Robbery in the First Degree, recklessly cause the death of

George K. Coverdale, in violation of Title 11, § 636(a)(2) of the Delaware Code.

### COUNT 4—POSSESSION OF A FIRE-ARM DURING THE COMMISSION OF A FELONY—S03-05-0580

**MICHAEL R. SMITH**, on or about the 17th day of April, 2003, in the County of Sussex, State of Delaware, did knowingly possess a firearm, a handgun, during the commission of Murder in the First Degree, a felony, as set forth in Count # 3 of this Indictment, which is herein incorporated by reference, in violation of Title 11, § 1447A(a) of the Delaware Code.

### COUNT 5—ROBBERY IN THE FIRST DEGREE—S03-05-0135

**MICHAEL R. SMITH**, on or about the 17th day of April, 2003, in the County of Sussex, State of Delaware, when in the course of committing theft, used or threatened the immediate use of force upon George K. Coverdale, with intent to compel the said George K. Coverdale to deliver up his property and in the course of the commission of the crime, he or another participant in the crime displayed what appeared to be a deadly weapon, a firearm, in violation of Title 11 § 832(a)(2) of the Delaware Code.

### COUNT 6—POSSESSION OF A FIRE-ARM DURING THE COMMISSION OF A FELONY—S03-05-0138

**MICHAEL R. SMITH**, on or about the 17th day of April, 2003, in the County of Sussex, State of Delaware, did knowingly possess a firearm, a handgun, during the commission of Robbery in the First Degree, a felony, as set forth in count # 5 of this Indictment, which is herein incorporated by reference, in violation of Title 11, § 1447A(a) of the Delaware Code.

### COUNT 7—ROBBERY IN THE FIRST DEGREE—S03-05-0136

**MICHAEL R. SMITH**, on or about the 17th day of April, 2003, in the County of Sussex, State of Delaware, when in the course of committing theft, used or threatened the immediate use of force upon Deshawn Christopher Blackwell, with intent to compel the said DeShawn Christopher Blackwell to deliver up his property and in the course of the commission of the crime, he or another participant in the crime displayed what appeared to be a deadly weapon, a firearm, in violation of Title 11 § 832(a)(2) of the Delaware Code.

### COUNT 8—POSSESSION OF A FIRE-ARM DURING THE COMMISSION OF A FELONY—S03-05-0139

**MICHAEL R. SMITH**, on or about the 17th day of April, 2003, in the County of Sussex, State of Delaware, did knowingly possess a firearm, a handgun, during the commission of Robbery in the First Degree, a felony, as set forth in count # 7 of this Indictment, which is herein incorporated by reference, in violation of Title 11, § 1447A(a) of the Delaware Code.

### COUNT 9—CONSPIRACY IN THE SECOND DEGREE—S03-05-0141

s/M. JANE BRADY
ATTORNEY GENERAL
/s/ James W. Adkins
DEPUTY ATTORNEY GENERAL
DATED: 5/27/03
A TRUE BILL,
/s/ —————
FOREMAN
/s/ —————
SECRETARY

**MICHAEL R. SMITH**, on or about the 17th day of April, 2003, in the County of

Sussex, State of Delaware, when intending to promote the commission of a felony, did agree with another person to engage in conduct constituting the felony of Robbery in the First Degree and did commit an overt act in the furtherance of said conspiracy, in violation of Title 11, § 512(1) of the Delaware Code.

## COUNT 1—MURDER FIRST DEGREE

Delaware law defines the offense of Murder in the First Degree as follows:

A person is guilty of Murder in the First Degree when the person intentionally causes the death of another person.

In Count 1 of the indictment the defendant is charged with Murder in the First Degree.

In order to find the defendant guilty of Murder in the First Degree, you must find that the State has established all of the following elements beyond a reasonable doubt:

1. The defendant caused the death of George K. Coverdale. By this, I mean that the defendant by his own voluntary act must have brought about the death, which would not have happened but for such act.

### AND

2. The defendant acted intentionally. A person acts intentionally with respect to this element when it was his conscious object or purpose to cause the death of another person. Premeditation or deliberation is not required.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all of the elements as to this count which I have just stated, at or about the date and place stated in the indictment, you should find the defendant guilty of Murder in the First Degree. If you do not so find, or if you have a reasonable doubt as to any element of this offense, you must find the defendant not guilty of Murder in the First Degree, and you may consider the lessor-included offense of Murder in the Second Degree.

## MURDER IN THE SECOND DEGREE

The pertinent definition of the offense of Murder in the Second Degree in the Criminal Code is as follows:

A person is guilty of Murder in the Second Degree when the person recklessly causes the death of another person under circumstances which manifest a cruel, wicked and depraved indifference to human life.

In order to find the defendant guilty of Murder in the Second Degree, you must find that all of the following elements have been established beyond a reasonable doubt:

1. The defendant caused the death of George K. Coverdale.

### AND

2. The defendant acted recklessly under circumstances which manifested a cruel, wicked and depraved indifference to human life. A person acts recklessly with respect to death when:

The person is aware of and consciously disregards a substantial and unjustifiable risk that the risk of death exits or will result from the person's conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.

 

AND

3. The defendant's recklessness was such as to manifest a cruel, wicked and depraved indifference to human life. "Cruel, wicked and depraved indifference to human life" is a statutory phrase used in the definition of Murder in the Second Degree, but the phrase uses clear words of everyday use. The word "cruel" customarily refers to the malicious infliction of physical suffering upon living creatures, particularly human beings, or the unnecessary infliction of pain upon the body or the feelings or emotions. The word "depraved" has often been used to describe a mind that has ceased to care for human life, and the word "wicked" often is used in describing a bad or evil morality.

If, after considering all the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all the elements which I have just stated, at or about the date and place in question, you should find the defendant "guilty" of Murder in the Second Degree. If you do not so find, or if you have a reasonable doubt as to any element of this offense, you must find the defendant "not guilty" of Murder in the Second Degree, and you may consider the lessor-included offense of Manslaughter.

### MANSLAUGHTER

The pertinent definition of the offense of Manslaughter in the Criminal Code is as follows:

A person is guilty of manslaughter when he recklessly causes the death of another person.

In order to convict the defendant of Manslaughter, you must find that both of the following elements have been established beyond a reasonable doubt:

1. The defendant caused the death of George K. Coverdale.

2. The defendant acted recklessly. A person acts recklessly with respect to death when:

The person is aware of and consciously disregards a substantial and unjustifiable risk that the risk of death exits or will result from the person's conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy both the element which I have just stated, at or about the date and place in question, you should find the defendant "guilty" of Manslaughter. If you do not so find, or if you have a reasonable doubt as to any elements of this offense, you must find the defendant "not guilty" of manslaughter.

### ACCOMPLICE LIABILITY [COUNT 1—INTENTIONAL MURDER]

The State and the Defendant, Michael R. Smith, have stipulated that Shane DeShields actually shot and killed George K. Coverdale. I now instruct you that a person charged with committing one or more offenses may be convicted either as a principal for acts he committed himself or as an accomplice to another person guilty of committing those offenses. The principles of accomplice liability as set forth in this particular instruction apply to the alleged offense of Count 1—Murder in the First Degree. The pertinent statute of

the Delaware Criminal Code applicable to accomplice liability states as follows:

A person is guilty of an offense committed by another person when intending to promote or facilitate the commission of the offense the person (a) solicits, requests, commands, importunes or otherwise attempts to cause the other person to commit it; or (b) aids, counsels or agrees or attempts to aid the other person in planning or committing it.

A person may be found guilty as an accomplice of an offense committed by another person if you are satisfied beyond a reasonable doubt that the following elements are proven:

(1) Shane DeShields committed the elements of the offense charged, or Shane DeShields and Michael R. Smith together committed the elements of the offense charged. The offense charged is Count 1—Murder in the First Degree.

(2) The person alleged to be the accomplice acted intentionally; that is, he intended to promote or facilitate the commission of the offense charged; and

(a) The person alleged to be the accomplice solicited, requested, commanded, importuned, or otherwise attempted to cause the other person to commit the offense; or

(b) The person alleged to be the accomplice aided, counseled or agreed or attempted to aid the other person in planning or committing the offense.

In other words, for the defendant, Michael R. Smith, to be liable as an accomplice, you must be unanimously satisfied beyond a reasonable doubt that the defendant, Michael R. Smith, when intending to promote or facilitate the commission of the offense, in some way either participated in the planning and/or commission of the crime or actively encouraged the other person to commit the crime either prior to or at the scene of the crime. Therefore, a person can be equally guilty with the person who actually committed the crime if the accomplice: (1) solicits, requests, commands or otherwise attempts to cause the other person to commit the crime; or (2) aids, counsels, or agrees or attempts to aid the other person in planning or committing the crime prior to or during the actual commission of the crime. The location of such soliciting, requesting, commanding, aiding, counseling, agreeing or attempting to aid need not be at or near the scene of the crime.

The mere presence of the defendant at the scene of the crime does not establish accomplice liability. Rather, the State must prove that the defendant, in addition to being present, aided, counseled, or attempted to aid another to commit the crime or that he, himself participated in the crime. You may find a defendant guilty of offenses committed by another person only if you are satisfied beyond a reasonable doubt that the offenses were within the scope of the agreed activity or were reasonably to be expected as incidental to that activity. Further, this statute does not confer accomplice liability if the participation by the defendant is only after the crime is actually committed.

Should you return a verdict of guilty, your verdict need not be unanimous as to a specific theory of liability as a principal or as an accomplice so long as you are all in general agreement as to the defendant's guilt.

Finally, there is another principle of the law of accomplice liability that is applicable to this case which I will now explain to you. The defendant has been charged with intentional murder in the first degree. Under the Delaware Criminal Code, the act of killing another person, a homicide, is a crime that is divided into degrees based upon different mental states. The degrees

 

of homicide are: Murder in the First Degree, Murder in the Second Degree and Manslaughter.

If you unanimously find beyond a reasonable doubt that there was a principal-accomplice relationship between Michael R. Smith and Shane DeShields with respect to the killing of George K. Coverdale, you must also unanimously decide what degree of homicide is compatible with Michael R. Smith's own culpable mental state, irrespective of the culpable mental state of any principal or other accomplice. In other words, even though you may find that Michael R. Smith was an accomplice in the criminal acts that resulted in the death of George K. Coverdale, Michael R. Smith is not necessarily guilty of homicide in the same degree as is Shane DeShields. The mental state required for each degree of homicide is defined as follows:

(1) Murder in the First Degree—The mental state is intentional. A person acts intentionally with respect to this element when it was his conscious object or purpose to cause the death of another person. Premeditation or deliberation is not required.

(2) Murder in the Second Degree—The mental state is reckless under circumstances which manifest a cruel, wicked and depraved in difference to human life. "Reckless" is defined as:

> The person is aware of and consciously disregards a substantial and unjustifiable risk that the risk of death exits or will result from the person's conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.

The word "cruel" customarily refers to the malicious infliction of physical suffering upon living creatures, particularly human beings, or the unnecessary infliction of pain upon the body or the feelings or emotions. The word "depraved" has often been used to describe a mind that has ceased to care for human life, and the word "wicked" often is used in describing a bad or evil morality.

(3) Manslaughter—The mental state is reckless. "Reckless" is defined as:

> The person is aware of and consciously disregards a substantial and unjustifiable risk that the risk of death exits or will result from the person's conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.

### COUNT 3—MURDER FIRST DEGREE

Delaware law defines the offense of Murder in the First Degree as follows:

> A person is guilty of Murder in the First Degree when:
> In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, the person recklessly causes the death of another person.

In Count 3 of the indictment, the defendant is charged with Murder in the First Degree.

In order to find the defendant guilty of Murder in the First Degree, you must find that the State has established all of the following elements beyond a reasonable doubt:

1. The defendant caused the death of George K. Coverdale.

AND

2. The defendant acted recklessly. A person acts recklessly when:

The person is aware of and consciously disregards a substantial and unjustifiable risk that the risk of death exists or will result from the person's conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.

AND

3. The death occurred in the course of and in furtherance of the commission or attempted commission of Robbery in the First Degree, a felony. "In furtherance of" means that the murder must be committed in order to facilitate the commission of the felony, Robbery in the First Degree. In other words, the murder must help move the Robbery in the First Degree forward. The death must be the consequence of the Robbery in the First Degree.

The offense of Robbery in the First Degree is defined in the instruction for Counts 5 and 7.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all of the elements which I have just stated, at or about the date and place stated in the indictment, you should find the defendant guilty of Murder in the First Degree. If you do not so find, or if you have a reasonable doubt as to any element of this offense, you must find the defendant not guilty of Murder in the First Degree.

## ACCOMPLICE LIABILITY [COUNT 3—FELONY MURDER]

The State and the Defendant, Michael R. Smith, have stipulated that Shane DeShields actually shot and killed George K. Coverdale. The following instructions apply to Count 3 only.

A person indicted for committing an offense may be convicted either as a principal for acts which he committed himself or as an accomplice to another person who actually committed the offense. One or both of the persons may be found guilty either as a principal for acts he committed himself or as an accomplice if he intended to aid another person in committing some or all of the acts necessary for the commission of the offense. The pertinent section of our Criminal Code is as follows:

A person is guilty of an offense committed by another person when intending to promote or facilitate the commission of the offense the person (a) solicits, requests, commands, importunes or otherwise attempts to cause the other person to commit it; or (b) aids, counsels or agrees or attempts to aid the other person in planning or committing it.

So, in order to find a person guilty of an offense committed by another person, you must find that all three of the following elements have been proven to your satisfaction beyond a reasonable doubt:

1. Shane DeShields committed the elements of the offense charged, or Shane DeShields and Michael R. Smith, together, committed the elements of the offense charged. The offense charged is Count 3—Felony Murder.

 

AND

2. Michael R. Smith intended to promote or facilitate the commission of the offense charged, and

(a) Michael R. Smith solicited, requested, commanded, importuned or otherwise attempted to cause Shane DeShields to commit the offense;

OR

(b) Michael R. Smith aided, counseled, or agreed or attempted to aid Shane DeShields in planning or committing the offense.

AND

3. The death of George K. Coverdale was within the foreseeable range of consequences following from the commission of Robbery in the First Degree.

The mere presence of the defendant at the scene of the crime does not establish accomplice liability. Rather, the State must prove that the defendant, in addition to being present, aided, counseled, or attempted to aid another to commit the crime or that he, himself participated in the crime. You may find a defendant guilty of offenses committed by another person only if you are satisfied beyond a reasonable doubt that the offenses were within the scope of the agreed activity or were reasonably to be expected as incidental to that activity. Further, this statute does not confer accomplice liability if the participation by the defendant is only after the crime is actually committed.

You should also be aware that in any prosecution for an offense in which the criminal liability of the accused is based upon the conduct of another person, it is no defense that the other person has not been prosecuted for or convicted of any offense based on the conduct in question.

Finally, the law provides that a person indicted as a principal for committing an offense may be convicted as an accomplice to another person guilty of committing the offense. Likewise, a person indicted as an accomplice to an offense committed by another person may be convicted as a principal.

Your verdicts must be unanimous, and the jury must unanimously find that a principal-accomplice relationship existed between the participants. However, there is no requirement that the jury be unanimous as to which of the parties was the principal and which was the accomplice as long as you are all agreed as to guilt.

## COUNTS 2, 4, 6, and 8—POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY

The pertinent definition of the offense in the Criminal Code is as follows:

"A person who is in possession of a firearm during the commission of a felony is guilty of possession of firearm during the commission of a felony."

In order to find the defendant guilty of Possession of a Firearm During the Commission of a Felony, you must find that all the following elements have been established beyond a reasonable doubt:

1. There was a firearm. "Firearm" is defined as:

"Any weapon from which a shot, projectile or other object may be discharged by force of combustion, explosive, gas and/or mechanical means, whether operable or inoperable, loaded or unloaded, excluding a BB gun."

2. The defendant possessed the firearm. Possession generally means dominion, control and authority, but a person is in possession of a firearm within the meaning of this section only when it is physical-

ly available and accessible to him during the commission of a crime.

3. The defendant acted knowingly. In other words, he was aware that he possessed a firearm.

4. The defendant possessed the firearm during the commission of a felony. These felonies are alleged to be the commission of Murder in the First Degree, which is defined in Count 1, or the lessor-included offenses of Murder in the Second Degree and Manslaughter, the commission of Murder in the First Degree, which is defined in Count 3, the commission of Robbery in the First Degree, which is defined in Count 5, and the commission of Robbery in the First Degree, which is defined in Count 7.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all the elements which I have just·stated, at or about the date and place· in the indictment, you should find the defendant guilty of Possession of a Firearm During the Commission of a Felony. If you do not so find, or if you have a reasonable doubt as to any element of this offense, you must find the defendant not guilty of Possession of a Firearm During the Commission of a Felony.

There are four separate counts and you must consider each count separately.

### COUNTS 5 and 7-ROBBERY IN THE FIRST DEGREE

The pertinent definition of Robbery in the First Degree in the Criminal Code is as follows:

A person is guilty of Robbery in the First Degree when the person commits the crime of Robbery in the Second Degree and when, in the course of the commission of the crime or immediate flight therefrom, the person or another participant in the crime displays what appears to be a deadly weapon.

Robbery in the Second Degree is defined as follows:

A person is guilty of Robbery in the Second Degree when, in the course of committing theft, the person uses or threatens the immediate use of force upon another person with intent to: (1) prevent or overcome resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compel the owner of the property or another person to deliver up the property or to engage in other conduct which aids in the commission of the theft.

In addition to its ordinary meaning, the phrase "in the course of committing theft" includes any act which occurs in an attempt to commit theft or in immediate flight after the attempt or commission of the theft.

The pertinent definition of Theft in the Criminal Code is as follows:

A person is guilty of Theft when the person takes, exercises control over or obtains property of another person intending to deprive him of it or appropriate it. It must be the defendant's conscious object or purpose to deprive the other person of the property.

In order to find the defendant guilty of Robbery in the First Degree, you must find that the following elements have been established beyond a reasonable doubt:

1. The defendant's conduct must have occurred in the course of committing theft, as I have defined that crime for you.

### AND

2. The defendant used or threatened the immediate use of force with the intent to (a) prevent or overcome resistance to the taking of the property or to the reten-

 

tion thereof immediately after the taking, or (b) compel the owner of the property or another person to deliver up the property or to engage in conduct which aids in the commission of the theft.

**AND**

3. The defendant displayed what appeared to be a deadly weapon to George K. Coverdale as to Count 5 and to Deshawn Blackwell as to Count 7, to wit: a firearm. Title 11 of the *Delaware Code* defines "deadly weapon" as including ... "a firearm, a bomb, a knife of any sort (other than an ordinary pocket knife carried in a closed position), switchblade knife, billy, blackjack, bludgeon, metal knuckles, slingshot, razor, bicycle chains or ice pick or any dangerous instrument which is used, or attempted to be used, to cause death or serious physical injury. "Dangerous Instrument" means any instrument, article or substance which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury.

If, after considering all of the evidence you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all of the elements which I have just stated, at or about the date and place stated in the indictment, you should find the defendant "guilty" of Robbery in the First Degree. If you do not so find, or if you have a reasonable doubt as to any element of this offense, you must find the defendant "not guilty" of Robbery in the First Degree.

There are two separate counts and you must consider each count separately.

*ACCOMPLICE LIABILITY AS TO ROBBERY IN THE FIRST DEGREE AND POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY*

As to Counts 5 and 7, which are Robbery in the First Degree, and Counts 2, 4, 6 and 8, which are Possession of a Firearm During the Commission of a Felony, the State alleges that the defendant is guilty of these offenses as either a principal or accomplice. The following instructions only apply to the above-referenced counts.

A person indicted for committing an offense may be convicted either as a principal for acts which he committed himself or as an accomplice to another person who actually committed the offense. One or both of the persons may be found guilty either as a principal for acts he committed himself or as an accomplice if he intended to aid another person in committing some or all of the acts necessary for the commission of the offense. The pertinent section of our Criminal Code is as follows:

A person is guilty of an offense committed by another person when intending to promote or facilitate the commission of the offense the person (a) solicits, requests, commands, importunes or otherwise attempts to cause the other person to commit it; or (b) aids, counsels or agrees or attempts to aid the other person in planning or committing it.

So, in order to find a person guilty of an offense committed by another person, you must find that all three of the following elements have been proven to your satisfaction beyond a reasonable doubt:

1. Shane DeShields committed the elements of the offenses charged, or Shane DeShields and Michael R. Smith, together, committed the elements of the offenses charged.

AND

2. Michael R. Smith intended to promote or facilitate the commission of the crimes charged; and

(a) Michael R. Smith solicited, requested, commanded, importuned or otherwise attempted to cause Shane DeShields to commit the offenses;

OR

(b) Michael R. Smith aided, counseled, or agreed or attempted to aid Shane DeShields in planning or committing the offenses.

The mere presence of the defendant at the scene of the crime does not establish accomplice liability. Rather, the State must prove that the defendant, in addition to being present, aided, counseled, or attempted to aid another to commit the crime or that he, himself participated in the crime. You may find a defendant guilty of offenses committed by another person only if you are satisfied beyond a reasonable doubt that the offenses were within the scope of the agreed activity or were reasonably to be expected as incidental to that activity. Further, this statute does not confer accomplice liability if the participation by the defendant is only after the crime is actually committed.

You should also be aware that in any prosecution for an offense in which the criminal liability of the accused is based upon the conduct of another person, it is no defense that the other person has not been prosecuted for or convicted of any offense based on the conduct in question.

Finally, the law provides that a person indicted as a principal for committing an offense may be convicted as an accomplice to another person guilty of committing the offense. Likewise, a person indicted as an accomplice to an offense committed by another person may be convicted as a principal.

Your verdicts must be unanimous, and the jury must unanimously find that a principal-accomplice relationship existed between the participants. However, there is no requirement that the jury be unanimous as to which of the parties was the principal and which was the accomplice as long as you are all agreed as to guilt.

## COUNT 9—CONSPIRACY IN THE SECOND DEGREE

Delaware law defines the offense of Conspiracy in the Second Degree as follows:

A person is guilty of conspiracy in the second degree when, intending to promote or facilitate the commission of a felony, the person agrees with another person or persons that they or 1 or more of them will engage in conduct constituting the felony or an attempt or solicitation to commit the felony.

In order to find the defendant guilty of Conspiracy in the Second Degree, you must find that all of the following elements have been proven beyond a reasonable doubt:

1. The defendant intended, that is, it was his conscious object or purpose to promote or facilitate the commission of a felony or felonies, in this case, two counts of Robbery in the First Degree.

AND

2. The defendant agreed with another person that they or one of them would engage in conduct constituting Robbery in the First Degree.

AND

3. The defendant, or another person with whom he conspired, committed an overt act in pursuance of the conspiracy.

An "overt act" is any act in pursuance of or tending toward the accomplishment of the purposes of the conspiracy.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all of the elements which I have just stated, at or about the date and place stated in the indictment, you should find the defendant guilty of Conspiracy in the Second Degree. If you do not so find, or have a reasonable doubt as to any element of this offense, you must find the defendant not guilty of Conspiracy in the Second Degree.

## PERMITTED INFERENCE OF STATE OF MIND

I have instructed you that an element of the offense charged is that the defendant acted with a required state of mind or with a particular belief. It is, of course, difficult to know what is going on in another person's mind. Therefore, our law permits the jury to draw an inference, or, in other words, to reach a conclusion about the defendant's state of mind from the facts and circumstances surrounding the acts the defendant is alleged to have done. In reaching this conclusion, you may consider whether a reasonable man in the defendant's circumstances would have had or lacked the requisite state of mind or belief. You should, however, keep in mind at all times that it is this defendant's state of mind or belief which is at issue here, and in order to convict the defendant, you are required to find beyond a reasonable doubt that the state of mind or belief required for guilt existed.

When recklessness suffices to establish an element of an offense, the element is also is established if a person acts intentionally or knowingly.

## DIRECT AND CIRCUMSTANTIAL EVIDENCE DEFINED

There are two types of evidence from which a jury may properly find the facts of a case. One is direct evidence. The testimony of an eyewitness is an example of direct evidence. The other is indirect or circumstantial evidence; that is, the proof of facts or circumstances from which the existence or non-existence of other facts may reasonably be inferred. In this case, the State and the defendant have relied in part upon circumstantial evidence.

It is not unusual in a criminal case to rely upon circumstantial evidence.

To warrant a conviction, all of the evidence, direct and circumstantial, must lead you to conclude beyond a reasonable doubt that the accused committed the offenses charged.

## CREDIBILITY OF WITNESSES AND CONFLICTS IN TESTIMONY

You are the sole judge of the credibility of each witness, including any expert witness, who has testified and of the weight to be given to the testimony of each.

If you should find the evidence in this case to be in conflict, then it is within your province to reconcile the conflicts if you can so as to make one harmonious story of it all. If you cannot reconcile these conflicts, then it is your duty to give credit to that portion of the testimony which you believe is worthy of credit, and you may disregard that portion of the testimony which you do not believe to be worthy of credit.

In considering the credibility of witnesses and in considering any conflict in testimony, you should take into consideration each witness' means of knowledge, strength of memory and opportunity for observations, the reasonableness or unreasonableness of the testimony, the consis-

tency or inconsistency of the testimony, the motives actuating the witness, the fact, if it is a fact, that the testimony has been contradicted, the witness' bias, or prejudice, or interest in the outcome of this litigation, the ability of the witness to have acquired the knowledge of the facts to which the witness testified, the manner and demeanor of the witness while on the witness stand, and the apparent truthfulness of the testimony, and any and all other facts and circumstances shown by the evidence which affect the credibility of the testimony.

An attorney may argue in closing that a witness lied while testifying.

## ATTORNEY'S BELIEF OR OPINION

The role of an attorney is to zealously and effectively advance the claims of the party he or she represents within the bounds of the law. An attorney may argue all reasonable inference from evidence in the record. However, it is not proper for an attorney to state his or her personal opinion as to the truth or falsity of any testimony or evidence or his or her opinion as to the guilt or innocence of an accused. What an attorney personally thinks or believes about the testimony or evidence in a case is not relevant, and you are instructed to disregard any personal opinion or belief concerning testimony or evidence which an attorney may have offered during the course of the trial.

Further, what an attorney states in his or her opening or closing arguments is not evidence. Evidence consists of testimony from witnesses testifying from the witness stand and exhibits introduced through their testimony. It is this evidence only which you may consider in reaching your verdicts.

## SYMPATHY

I instruct you that your verdict must be based solely and exclusively on the evidence in the case; that you cannot be governed by passion, prejudice, sympathy, public opinion or any motive whatever except a fair and impartial consideration of the evidence; and that you must not, under any circumstances, allow any sympathy which you might have or entertain for any of those involved to influence you in any degree whatsoever in arriving at your verdict.

## PRIOR OUT–OF–COURT STATEMENTS—11 DEL.C. § 3507

You have heard evidence of unsworn statements of a witness occurring before trial. By way of example, the testimony of Detective Mike Maher as to what was told to him prior to trial by Deshawn Blackwell and Shane DeShields. Such testimony is permissible, under a provision of a Delaware statute, which reads, in pertinent part, as follows:

"(a) In a criminal prosecution, the voluntary out-of-court statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

(b) The rule in subsection (a) of this section, shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not . . ."

With regard to this provision, caution must be exercised by the jury when a conflict exists between the out-of-court statements and the in-court testimony, or when a conflict exists among the out-of-court statements themselves. The jury should be particularly careful if there is no evidence to corroborate an inconsistent

out-of-court statement. Nevertheless, the jury may convict on such statement if it is satisfied beyond a reasonable doubt that the statement is true.

### SELF–DEFENSE

Self-defense is not applicable as a defense to the offenses in the indictment. Therefore, you may not consider self-defense as a defense to the offenses in the indictment.

### TAPE RECORDINGS AND TRANSCRIPTS

References have been made to transcripts of some of the witness's statements. The taped statements themselves have been admitted in evidence. As an aid, the Court has permitted you during trial to refer to the transcripts of the statements as you listened to the tapes. With regard to the tapes and the transcripts, the actual words of the witnesses control. If you conclude that the taped statement differs from the transcript of that statement, you are to be guided by the taped statement itself.

### STIPULATION OF FACTS

In this case the parties have stipulated to certain facts. A stipulation that is in evidence is an agreement by both sides that those facts giving rise to the stipulation require no further proof. You must accept these facts as true for the purposes of this trial.

### DIRECTIONS TO JURY UPON AUTHORIZED VIEW

During the course of the trial you were taken to the parking lot to view the Ford Aerostar van. You are not to consider what you saw during the viewing as evidence in this case. You should understand that the condition of the van may not be the same as on the day of the alleged offenses. This would include the position of the driver's seat and the location of personal property in the van. The van has been moved from the scene and searched. Instead, you should rely on the testimony that was presented in Court, including the photographs and videotape. The purpose of the viewing was simply to assist you in understanding and applying the testimony you heard and the exhibits introduced at this trial.

### WITNESS'S CONVICTION OF A CRIME

The fact that a witness had been convicted of a felony or of a crime involving dishonesty, if such be a fact, may be considered by you for only one purpose, namely, in judging the credibility of that witness. The fact of such a conviction does not necessarily destroy or impair the witness's credibility, and it does not raise the suggestion that the witness has testified falsely. It is simply one of the circumstances that you may take into consideration in weighing the testimony of such a witness.

### EXPERT WITNESSES

In this case, you have heard the testimony of expert witnesses. Expert witnesses may state their opinions and reasons for their opinions because by their education, training, or experience, they have become "expert" in their field.

You should, however, give such expert testimony only the weight you feel it deserves. If it is not based upon sufficient education, training, or experience, or if the reasons given in support are not sound, and you feel it is outweighed by other evidence, you may disregard it entirely.

### EVIDENCE STICKERS

You are directed to disregard the red and blue evidence stickers on the exhibits.

They are the stickers for the trial of Shane DeShields and are not relevant for the purpose of the trial of Michael R. Smith. The white and green stickers are being used for the trial of Michael R. Smith.

## PRESUMPTION OF INNOCENCE— REASONABLE DOUBT

The law presumes every person charged with a crime to be innocent. This presumption of innocence requires a verdict of not guilty, unless you are convinced by the evidence that the defendant is guilty beyond a reasonable doubt.

The burden of proof is upon the State to prove all of the facts necessary to establish the crime charged beyond a reasonable doubt.

Reasonable doubt is a practical standard.

On the one hand, in criminal cases the law imposes a greater burden of proof than in civil cases. Proof that a defendant is probably guilty is not sufficient.

On the other hand, there are very few things in this world that we know with absolute certainty. Therefore, in criminal cases, the law does not require proof that overcomes every possible doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. Therefore, based upon your conscientious consideration of the evidence, if you are firmly convinced that the defendant is guilty of the crime charged, you should find the defendant guilty. If, on the other hand, you think there is a real possibility or, in other words, a reasonable doubt about the defendant's guilt, you must give the defendant the benefit of the doubt by finding the defendant not guilty.

## JURY'S DELIBERATIONS

Before concluding, I want to say a few words about your deliberation process. How you conduct your deliberations is solely within your province. However, I would like to suggest that you discuss the issues fully, giving all jurors a fair opportunity to express their views, before committing yourself to a particular position. Each of you has a duty to consult with the others with an open mind and to deliberate with a view toward reaching an agreement. Each of you should decide the case for yourself, but only after impartially considering the evidence with your fellow jurors. You should not surrender your honest convictions solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict, but you should not hesitate to re-examine your own view and change your opinion if you are persuaded by another view.